### DONAHOE, *prochein ami, versus* RICHARDS *& als.*

The duties imposed upon the superintending school committee, as to expelling scholars from a public school, partake of a judicial character, and for an *honest* though *erroneous* discharge of them, they are not liable in a suit for damages to the person expelled.

With such committee, the Legislature have reposed the power of directing the general course of instruction, and what books shall be used in the schools; and they may rightfully enforce obedience to all the regulations by them made, within the sphere of their authority.

For a refusal to read from a book thus prescribed, the committee may, if they see fit, expel such disobedient scholar.

No scholar can escape or evade such requirement when made by the committee, under the plea that his *conscience* will not allow the reading of such book.

Nor can the ordinance be nullified, because the church of which the scholar is a member, hold, and have so instructed its members, that it is a *sin* to read the book prescribed.

A law is not unconstitutional, because it may prohibit what one may *conscientiously* think right, or require what he may *conscientiously* think wrong.

A requirement by the superintending school committee, that the *Protestant version* of the Bible shall be read in the public schools of their town, by the scholars who are able to read, is in violation of no constitutional provision, and is binding upon all the members of the schools, although composed of divers *religious sects.*

ON EXCEPTIONS from *Nisi Prius,* HATHAWAY, J., presiding.

TRESPASS ON THE CASE.

This action was brought by plaintiff, through her father, as her *prochein ami,* against the superintending school committee to recover damages for maliciously, wrongfully and unjustifiably expelling her from one of the town schools in Ellsworth. The plaintiff was 15 years of age, and was expelled for refusing to read in the school, of which she was a member, the Protestant version of the English Bible, which had previously been ordered to be used therein by the defendants.

The same counts were in the writ as in that of *Donahoe* v. *Richards & al., ante* p. 376, *mutatis mutandis,* the same facts were offered to be proved, and the same directions given, and agreement made as in that case. The plaintiff excepted to the order of the Judge. This and the next preceding case were argued together.

*Rowe & Bartlett,* in support of the exceptions, in their opening argument, maintained the following points:—

1. Under our constitution, superintending school committees have no authority to pass such an ordinance.

2. The expulsion of a scholar, for refusing to comply with such an ordinance, subjects the committee to an action of damages. Public schools in this State are not merely creations of the Legislature, but exist by special provisions of the constitution. Const. of Maine, art. 8. The term

"public" implies that children of a suitable age will be entitled to enjoy their benefits. Exclude any one on account of color or sect, and they cease to be public. Temporary exclusions may be made for temporary causes; but no perpetual exclusions are allowed.

3. This ordinance excludes a whole class of our citizens from the enjoyment of the schools.

4. The committee acting under a statute in making that ordinance, it can have no more force than an Act of the Legislature. The Legislature has no power to pass an Act, establishing a religious test for admission to, or continuance in a public school, nor to make any requirement of the scholars, which shall exclude any on account of their religious belief; nor to compel, or authorize any town to raise any tax or to expend any money for disseminating any religious book. Such legislation would violate the constitution. Const. of Maine, art. 1, § 3.

5. This ordinance establishes a preference of the Protestants over the Catholics; and creates a religious test.

6. Its opposition to the spirit of the constitution is equally obvious. The religious sentiment is not to be interfered with by government. Perley's Debates on the adoption of the Constitution, pp. 71 to 88.

7. The school committee exercise both administrative and judicial power. If they act oppressively in exercising the former, and exceed their jurisdiction in the latter, an action lies for damages, in favor of the party injured. The wrong done here is similar to that done by a moderator in refusing a vote at an election. The remedy should be similar. It has long been settled, that in such case, an action on the case will lie and that without proof of malice. *Ashley* v. *White*, Ld. Raymond, 938; 1 Smith's Leading Cases, 105, and notes; *Lincoln* v. *Hapgood*, 11 Mass. 350; *Osgood* v. *Bradley*, 7 Maine, 411; *Oakes* v. *Hill*, 10 Pick. 333. But the injury here is much greater than in such a case.

*J. A. Peters*, and *R. H. Dana, jr.*, of Massachusetts, *contra*.

1. The defendants being public officers, exercising a discretion in the discharge of a public duty, judicial in its character, cast upon them by the law, are not liable to this action, while acting in good faith, without malice, and within their appropriate sphere. *Wheeler* v. *Patterson*, 1 N. H. 88; *Griffin* v. *Rising*, 11 Metc. 339; *Dinsmore* v. *Nilhes*, 7 How. 89; *Dinsmore* v. *Nilhes*, 12 How. 390.

The decision by the defendants on the necessity to " the peace and usefulness of the school," that the plaintiff should be expelled, is conclusive. *Allen* v. *Blunt*, 3 Story, 141.

*Lincoln* v. *Hapgood*, 11 Mass. 350, cited by plaintiff, is an exception to the rule. It was not decided on authority, and has not been followed in any other State. *Wheeler* v. *Patterson*, 1 N. H. 88; *Jenkins* v. *Waldron*, 11 Johns. 114; *Rail* v. *Potts*, 8 Humph. 225; 5 Hall & Worell, 553. See language of Court in *Spear* v. *Cummings*, 23 Pick. 227.

In Massachusetts, it has not been extended, but always questioned and restricted. *Capen* v. *Foster*, 12 Pick. 485; *Gates* v. *Neal*, 23 Pick. 308; R. S., c. 3, § 9; *Blanchard* v. *Stearns*, 5 Met. 298; *Griffin* v. *Rising*, 11 Met. 339.

In Maine, where *Lincoln* v. *Hapgood* was common law, its principle has never been sustained on argument, and has been corrected by statute. See note to 2d ed. of 7 Greenl. *Osgood* v. *Bradley*.

The language of the Court in the following cases is inconsistent with the notion that the school committees are liable. *Spear* v. *Cummings*, 23 Pick. 224; *Roberts* v. *Boston*, 5 Cush. 205, language on pp. 205 and 209; *Sherman* v. *Charlestown*, 8 Cush. 161, language on p. 165. See also, Statutes of Massachusetts, 1845, c. 214.

But it may be said, that in executing the power conferred on us by the statute, we have gone an unreasonable length, and so far violated the common rights of the plaintiff, as to make our course unconstitutional. We take the ground then, —

2. Continuing the use of the English Bible as a text

book, in the public schools, is a reasonable exercise of discretion.   The entire book is the noblest monument of style, of thought, of beauty, of sublimity, of moral teaching, of pathetic narrative, the richest treasury of household words, of familiar phrases, of popular illustrations and associations, that any language has ever possessed.

The contested passages have never been, so far as appears, read in the school.   Can any one doubt that the real question is not whether each child shall choose its version, but whether the Bible shall be read at all ?

3. The acts of the defendants are justifiable under the statute law of the State.   Act 1850, c. 193, art. 5, § § 4, 7 and art. 7, § 2, and by judicial decisions.   *Sherman* v. *Charlestown*, 8 Cush. 161; *Spear* v. *Cummings*, 23 Pick. 225; Language of STORY, J., p. 200 of 2 Howard, *Girard Will Case*.

4.   This power of the committee is not in conflict with any clause of the constitution, and the Legislature had the right to confer it, under art. 4, § 1, and art. 8 of the constitution.

It is not in conflict with the right of all to enjoy the benefits of free schools.   This is not an absolute, exclusive personal right, but a common right, to be enjoyed under conditions and limitations.   *Sherman* v. *Charlestown*, 8 Cush. 161; *Spear* v. *Cummings*, 23 Pick. 224.

It is not in conflict with § 3 of the bill of rights, which declares that no one shall be " hurt, molested or restrained, in person, liberty or estate, for his religious professions or sentiments."   This section was made *alio intuiter*.   *Thurston* v. *Whitney*, 2 Cush. 104.

The plaintiff has not been hurt, molested or restrained, in her person, liberty or estate, for her religious professions or sentiments, in the sense of the constitution.   The ground of objection from the payment of taxes is not open to her, but only in the action by the father in his own right.   But neither of them have been so hurt, &c., in the sense of the constitution.

Even if the statute has been incidentally the occasion of loss to them, or diminution of any right, it is not, for that reason, unconstitutional, if its object, *intuitus* and direct effect are to carry out a constitutional purpose, by reasonable means, judged necessary by the competent authority, and the conflict with the plaintiff's right is incidental, remote and unintended.   In such case it is *damnum absque injuria.*

Illustrations of this position may be drawn from various cases of conflict of constitutional principles with public and private right.

Private property cannot be taken for the public use, except upon compensation being made; yet a franchise may be impaired or destroyed in value, by another franchise erected for the public good, (*Warren Bridge* v. *Charles River Bridge,* Peters' R.,) and all cases of the same nature since, relating to railroads, turnpikes, toll bridges, &c.   In New York, houses may be destroyed to prevent the spread of fire, without compensation.   See also *Tewksbury's case,* 11 Metc. 55.

Congress alone can regulate commerce and impose duties on imports; yet States may pass health, quarantine and inspection laws, lay tolls on merchandize carried on turnpikes or navigable rivers, for certain purposes, restrict and restrain to some extent, the landing of passengers, and require certain bonds or payments from them, and restrict the sale of certain articles of commerce.   (5 Howard, 504, and 7 Howard, 293, and cases there cited.)  Although these laws operate to regulate commerce and to impose something like duties, yet they are held constitutional, so far as they are reasonable and proper in extent and application, for the execution of lawful powers in the States.

The Sunday laws are held constitutional, although they operate to deprive the Jews of one sixth of their time for labor.   Laws requiring all men to bear arms, in time of war, under penalty of a fine, would be constitutional, notwith-

standing the religious belief of some precluded them from doing so.

The constitution prohibits religious tests as qualifications for public office; yet all judicial officers may be required to administer oaths, although the religious scruples of quakers and others preclude them from ever holding those offices. Blacks may be assigned to separate schools, as a reasonable regulation, although the act causes an inequality and some inconvenience. *Roberts* v. *Boston,* 5 Cush. 198.

The history of the law respecting the public support of religious teaching and worship in Massachusetts, which subsisted under the same clause of the constitution relied upon by the plaintiff, shows that the clause is not so construed as to prohibit a person's being taxed for a public purpose which his religious belief precludes him from availing himself of. *Oakes* v. *Hill,* cited by plaintiff.

The best view of the case for either plaintiff is this, his religious belief precludes his taking the benefit of the schools which he is taxed to support, on account of a regulation therein. The answer is that, as the Legislature is required to support and regulate public schools, the regulation in question is not unconstitutional, inasmuch as it is made in the execution of a legal power, with a proper *intuitus* and direct effect, and cannot be judicially pronounced to be evidently unreconcilable, and its effect on the plaintiff through his religious belief is indirect and incidental.

*Rowe,* in reply.

Whether this suit can be maintained without proof of malice, is a question which has not yet arisen. It may arise in a subsequent stage. By the copy of the declaration in the writ, which the learned counsel seems not to have read, though it is made part of the case, it seems malice is alleged. We offered to prove that the act complained of was done deliberately, and was to our injury. If it was also illegal, then we had a right to argue, and the jury would be authorized to find, that it was done maliciously. The case of *Wheeler* v. *Patterson,* 1 N. H., 88, cited in defence, recog-

nizes it. The discussion then, of the first proposition of the counsel is premature. As to the case of *Lincoln* v. *Hapgood,* however it may be regarded elsewhere, it is still law in this State, according to the case cited in the opening.

The only question we intended to present, is whether, under our constitution and laws, the committee have a right to make a willingness on the part of a child to receive such religous instruction as they may direct to be given a condition for the admission, or continuance of such child as a scholar in a public school. That question is presented by the case, unless the committee acted hastily and without proper evidence of obstinacy, and therefore we are entitled to maintain our action, which advantage we expressly waive, for the purpose of having the main question settled. This question the learned counsel seems unwilling to meet. He denies that the reading of the Bible is a religious exercise, and quibbles about there being no allegation or proof that Bridget was required to read any doctrinal passages. But by the ordinance of the committee the scholars were required to read the whole. A willingness to read the whole was required of Bridget; and she was expelled because she would not promise to read the whole.

She was required to take part in a religious exercise from which her conscience shrunk, because, as she believed, God's word was perverted in its meaning. But the counsel contends there is little difference in the two versions, only in some half dozen doctrinal passages, which are never read. (How does he know that?) That course of argument might be appropriate before a jury, to convince them that those conscientious scruples were not real, but here it is out of place. If the counsel is right as to the difference, why in the name of common sense and christian charity, did not the Committee allow the child to use her own translation? The moral teaching of each is the same.

How far these translations differ is not a question for this court to decide; it is enough for this case that one of them is such that the reading of it is deemed a sin by the plaintiff.

But the learned counsel, in one portion of his argument meets the main question. He alleges that " the power must be lodged somewhere to determine what books shall be read," so as "to conduce to the greatest good of the greatest number;" that is, if I understand it, as protestants regard instruction in protestant christianity as the most essential branch of education, therefore if the majority of the school be protestants, the committee may enforce such a system of instruction upon all; and Mahomedans, catholics, or Mormons may follow their example if they get the power. "The greatest good of the greatest number." This tyrannical doctrine of pure democracy, we generally hear only from the lips of demagogues. Lawyers and statesmen have usually supposed that one great object of a written constitution was to do away with a principle so obviously unjust, and to substitute for it, the equal good of all. But after asserting this doctrine, the counsel immediately abandons it, by affixing the limitation, that they shall not exercise this power for any sectarian purpose. So that the power of the committee, and the rights of the scholars, depend not upon the nature of their acts or their effects, but upon their secret motives. And a whole sect may be driven out of the school, unless the injured party can prove that the *sole* object of the committee was to give religious instruction. Under the name of history, of metaphysics, or of logic, or philosophy, or for the purposes of "style," the writings of the French infidels of the last century, or of the German rationalists of this, may be introduced into our schools, to the horror of pious orthodox parents, who regard them as poison, not to be touched by a child, and according to the doctrine of the counsel they are without remedy.

Our whole case proceeds upon the ground that the reading of the scriptures was required as a religious exercise. The Bible is the religious book of Christians. If the defendants admit they had no right to use it thus, but contend they had a right to use it for other than these primary purposes, or for the improvement of " style," or the cultivation of the fancy or

imagination," then this fact should be set up, and shown in defence, and the jury should be allowed to pass upon the question for what purpose it was used.

The denial on the other side, that the reading was intended as a religious exercise, and the argument based upon it, seems hardly consistent with the frequent appeals in favor of its use, resting obviously upon the idea that the Bible is the great book of our religion.   He says "it will hardly be argued that this is an establishing by law of a subordination or preference of one sect to another.   The law makes no such preference.   It is based on the principle of majorities. The majority of each town elect the committee, and thus select the books."   If I understand the argument then, it is this, that although an Act of the Legislature, requiring the reading of the protestant version in schools would make such a subordination or preference by law, and therefore be unconstitutional; yet the passing such an ordinance by the school committee, elected by the inhabitants of the town under an Act of the Legislature is not unconstitutional, because it is not a law; that the Legislature can confer upon the school committee a power to legislate which they cannot exercise themselves; that the protestants of the whole State cannot make a law to oppress their catholic fellow citizens, but they can confer power to do so upon the protestants of any village.

This evil suffered by the catholics grows out of the doctrine of majorities, says the counsel, and if they find themselves oppressed, they must resort for redress, to the ballot box, and failing there, to the Legislature.   I had supposed the ballot box presented a practical remedy for wrongs to majorities only; that the resort to the Legislature, would be of advantage only to those who had the power to influence a majority of its members; and that an oppressed minority could have no relief but under the protection which the constitution guarantees, and this Court affords.   But this protection, the counsel says, we cannot have in this case, because the evil was done indirectly and

for the purpose of effecting a legal object. That we deny, and say the case does not warrant such an assumption on his part. If it were otherwise, I should deny the correctness of his doctrine. He admits that religious instruction cannot be enforced *eo nomine*, and does not deny, that under our constitution a man cannot be taxed against his will, for the support of any religious instruction whatever; but contends that children may be compelled to receive, and parents to pay for, any kind or amount of sectarian religious instruction, provided a jury can be made to believe that the imparting of such instruction was not the primary object.

The doctrine advanced is attempted to be supported by cases supposed to be analogous. That the right of property in any thing is but a limited power of using that thing, is a doctrine familiar to all. It is expressed in the maxim quoted; "*Sic utere tuo ut alienum non laedas.*" Upon this principle rest the decisions in *Tewksbury's* and *Alger's* cases, cited by the gentleman, and in all cases of the like nature, as to harbors and rivers, health laws, intramural burials. So too as to another class of cases to which he refers, growing out of grants for bridges and railways; these cases all rest, not on the ground that the less must yield to the greater, but on the ground that there is no invasion of constitutional rights at all.

So in that class of cases under the clause of the constitution of the U. S., conferring upon the general government the power to regulate commerce, there is no question of *individual rights*, but the only contest is which of the two governments, State or National, shall exercise certain powers. This doctrine in relation to *intuities*, on which the counsel lays so much stress, extends thus far, that a State Legislature will not be allowed to usurp powers granted to Congress, under the pretence of exercising those which are reserved to the State.

The reference made also to Jews and quakers gives no strength to the position taken. Our laws allow the Jew to

work on Sunday, provided his Sabbath is on Saturday in fact, and the expulsion of a Jewish scholar from school, for refusal to attend on the Jewish Sabbath would seem too illegal to discuss. And our law expressly excepts quakers and others conscientiously scrupulous about taking oaths, from the necessity of taking them.

It is conceded, that under our constitution, every child has a right to receive instruction at the public schools; that every parent has a right to have his child there taught; it is not contended that there exists any where a right to force religious instruction, *directly*, upon those who are unwilling to receive it; it is not claimed that any right exists to tax one for support of religious instruction, *directly*, without his consent. Perfect religious freedom is the right of every one. Now do these cases show any necessary collision between these different rights? Cannot these plaintiffs enjoy all unimpaired? Cannot all that is required to be taught at our common schools, science, letters and morals, be taught with the use of the Douay version? The morality of the two versions is the same; the catholics prefer the "style" of their own translation.

There was no necessity for the child's sacrificing any portion of the constitutional right of liberty of conscience, in order to secure her right to a common school education. The conduct of the committee was the wanton exercise of arbitrary power. Petty persecution is always a blunder, defeating its own object. To be successful a persecution must be cruel, relentless and crushing, like that which exterminated protestantism from southern Europe, but such as that cannot exist in this country. The course adopted by defendants, and threatened to be persevered in by counsel, seems to me to be as impolitic as it is unjust. We wish to instil into the children of emigrants our own notions of religious liberty. The best way to accomplish that object is to keep them intermingled with protestant children in our public schools.

APPLETON, J.,—It was decided in *Donahoe* v. *Richards*, *ante* p. 376, that the expulsion of a minor child from the public schools by the superintending school committee, even if wrongful, was no violation of any legal right of the parent, and would not entitle him to maintain an action therefor; that the wrong in such case is committed against the child, and that if entitled to redress, it must be sought in its name.

The present suit is by the minor, for her alleged wrongful exclusion from school in consequence of her refusal to read in one of the books directed by the defendants, who are the superintending school committee of the town of Ellsworth, to be used in the school of which she was a member.

The questions involved in the decision of this case are their liability, when acting in good faith in the discharge of their duty, to an action at the suit of the individual expelled, even if the exclusion was erroneous — their powers as to the selection of books to be used — their legal right to expel a scholar in case of a refusal to read in a book by them prescribed — the constitutionality of a regulation by which the Bible, or any version of it, is designated as one of the books to be used.

The education of the people is regarded as so much a matter of public concern, and of such paramount importance, that the constitution of this State imposes on the Legislature the duty to make suitable provisions for the support and maintenance of the public schools. " A general diffusion of the advantages of education being essential to the preservation of the rights and liberties of the people; to promote this important object, the Legislature are authorized and it shall be their duty to require the several towns to make suitable provision at their own expense, for the support and maintenance of public schools." Const., art. 8.

This requirement of the constitution can only be rendered effectual by the enacting of fitting and appropriate laws. Different acts have been passed at different times to carry into full effect this constitutional duty. In 1850, the previous legislation of the State on this subject was repealed

and new enactments passed, which still remain in force, and under which the defendants justify their acts.

1. The defendants are public officers discharging important public trusts, and in the exercise of this authority necessarily clothed, to a certain extent, with judicial powers. In doing the act of which complaint is made, they were acting under the obligations of official duty and the sanctions of an oath. The plaintiff claims that when thus acting, and without malice or intentional wrong on their part — they can be held responsible in damages for an erroneous decision — an error of judgment either as to the facts or as to the consequences rightly deducible therefrom. In fine, that they should be held liable if they erred in judgment upon a matter submitted to their determination, and upon which they were bound to act.

By the act of 1850, c. 193, art. 5, § 1, the powers and duties of superintending school committees are defined and established, and the authority is given them " to expel from any school, any obstinately disobedient and disorderly scholar, after a proper investigation of his behavior, if found necessary for the peace and usefulness of the school; also to restore him to the school, on satisfactory evidence of his repentance and amendment." After investigation they are to determine what is to be done. If in the discharge of their duty in good faith and integrity, they err, it is only what is incident to all tribunals. To hold them legally responsible, in such a case, would be to punish them for the honest convictions of the understanding in the decision of a matter submitted to them, and upon which, having assumed jurisdiction, they could not rightfully withhold a decision. The general principle is established by an almost uniform course of decisions, that a public officer, when acting in good faith, is never to be held liable for an erroneous judgment in a matter submitted to his determination. All he undertakes to do, is to discharge his duty to the best of his ability, and with integrity. That he may never err in his judgments, or that he may never decide differently from

Donahoe *v.* Richards.

what some other person may think would be just, is no part of his official undertaking.

The plaintiff rests her right to recover upon the case of *Lincoln* v. *Hapgood,* 11 Mass. 350, where it was held, that an action could be maintained against the selectmen of a town for refusing to receive the vote of a qualified elector, although not chargeable with malice. This decision, though regarded as law in Massachusetts and in this State, is at variance with the law as established in England and in most of the States of this Union, in which the question has arisen. In the opinion of PARKER, C. J., in *Lincoln* v. *Hapgood,* reference is made to *Harmon* v. *Tappenden,* 1 East, 563, where the law was held otherwise. The doctrine of *Harmon* v. *Tappenden* was subsequently affirmed by ABBOTT, C. J., in *Cullen* v. *Morris,* 2 Stark. 577. In *Jenkins* v. *Waldron,* 11 Johns. 114, the Court say that in their opinion it "would be opposed to all the principles of law, justice and sound policy, to hold that officers, called upon to exercise their deliberate judgments, are answerable for mistakes in law, either civilly or criminally, when their motives are pure and untainted with fraud or malice." Such, too, was regarded as the law in New Hampshire, in *Wheeler* v. *Patterson,* 1 N. H. 89, and in Tennessee, in *Ball* v. *Batts,* 8 Humph. 225.

But without impugning the authority of *Lincoln* v. *Hapgood,* in reference to the point there decided, it may be sufficient to remark that the doctrine therein set forth presents no such equitable considerations in its favor, as to require it to be extended to cases, in which it is not directly applicable. Such indeed seems to have been the view of the Court of the State in which that case was decided, in other instances, where its authority was invoked. In *Spear* v. *Cummings,* 23 Pick. 224, it was held that the teacher of a town school was not liable to an action by a parent for not instructing his children ; and in the opinion delivered, the Court remarked, that the principle established in *Lincoln* v. *Hapgood,* "is not applicable to the case under consideration

and cannot be relied on as a precedent." In *Griffin* v. *Rising*, 11 Met. 339, it was decided that no action could be maintained against assessors, by an individual who is liable to taxation, for their omission to tax him, whereby he lost his right to vote at an election, unless it be shown affirmatively that they omitted to tax him willfully, purposely, or with a design to deprive him of his vote. In *Wilkes* v. *Dinsman*, How. 89, it was held, in a suit brought by a marine against the commanding officer of a squadron, that the commander was a public officer, invested with certain discretionary powers, and that he could not be made answerable for any injury, when acting within the scope of his authority, and not influenced by malice, corruption or cruelty; that his position was *quasi* judicial — that the acts of a public officer in public matters, within his jurisdiction, and where he has discretion, are to be presumed legal — and that it is not enough to show he committed an error in judgment, but it must have been a malicious and willful error. The plaintiff would seem not entitled to recover according to the general principles and analogies of the law. But the very question here presented arose in New York in *Stephenson* v. *Hall*, 14 Barb. 222, in which it was held that the action could not be maintained. In delivering the opinion of the Court, ALLEN, J., says: "The trustees have the power, and it is their duty to dismiss or exclude a pupil from the school, when in their judgment, it is necessary for the good order and proper government of the school so to do. They had no personal interest to gratify or benefit, they were acting for the public without salary or reward. They acted, as they believed, judiciously, in a matter of discretion, pertaining to the duties of their office. If they erred in judgment in such case, they ought not to be liable to an action."

The defendants therefore, however much they may have misjudged their duty, are not liable if they acted honestly.

2. By the act before referred to, under art. 5, § 1, among various powers and duties conferred upon the superintending school committee, they are empowered "fourthly, to direct

the general course of instruction, and what books shall be used in the respective schools."

The right to prescribe the general course of instruction and to direct what books shall be used, must exist somewhere. The Legislature have seen fit to repose the authority to determine this in the several superintending school committees. They may therefore rightfully exercise it.

The power thus conferred, is in the most literal and explicit terms. The power of establishing by-laws is given to the several city governments of the State. This Court is authorized to establish rules for the regulation of business in Court. The only restriction in either case, is that the by-laws and rules thus established shall not conflict with the statutes and constitution of the State. Within these limits, they have all the force and vigor of legislative enactments. So, in this case, the same general and extensive power over this subject matter is granted, and the course of studies and the books prescribed by the superintending school committee are to be regarded as if established and prescribed by the Act of the Legislature.

The power of selection is general and unlimited. It is vested in the committee of each town. It was neither expected nor intended that there should be entire uniformity in the course of instruction or in the books to be used in the several towns in the State. The very distribution of power manifestly shows that no such intention could have existed. The manner of its exercise must depend upon the judgment, discretion and intelligence of the different committees. The actual selection at any given time and place, depends upon the views and opinions of those upon whom the law devolves this duty. The power of ultimate decision must rest somewhere. No right of appeal is granted. No power of revision is conferred upon any other tribunal. Because the right of selection may be injudiciously or unwisely exercised, it by no means follows that it does not exist. This Court cannot make an affirmative rule as to what books shall be selected, nor a negative rule prescribing what shall not be

used, if the right to selection be exercised in conformity with existing statutes and the constitution. The power of selection includes that of making injudicious and ill-advised selections, but there being no right of appeal, the selection is binding and conclusive.

But the argument is pressed upon our consideration that immoral and irreligious books may be selected — that children may be required to read the works of Strauss, or of Bentham, or of Hume. This may be so. But the exercise of power, which is the subject of complaint in this case, is not in that direction, nor is the danger that it will be, regarded as very urgent. The Legislature may undoubtedly make such a selection. So they may repeal any statute by which a crime, however atrocious, is punished, for the right to impose a punishment includes the right to modify or repeal it. If the Legislature, acting within constitutional limitations, should prescribe a course of instruction, however unwise, or books, however immoral, we are not aware of any power on the part of the Court to interfere. The abuse of a power is no argument against its existence. It is of the essence of all power that it may be exercised unwisely or abused by those to whom it is entrusted.

In the case supposed, the remedy is obvious and at hand. It is to be found where are found all the remedies for bad legislation — in the people. They elect those by whom the laws are passed. If the Legislature enact laws unwise, impolitic, removing the restraints on vice, or giving impunity to crime, the people have only to choose those for their agents by whom such legislation will be repealed. But if they will immoral legislation, — that murder shall remain unpunished, or that the reading books of the young shall be such as are adverse to the recognized principles of morality, no power is given to this Court to inhibit or annul such legislation. So if the committee, acting within their authorized limits, shall make an unwise and improper selection of books, the power to correct their misdoings is with those by whom they were elected, and whose wishes they have

Donahoe *v.* Richards.

violated. This government rests upon the great constitutional axiom "*that all power is inherent in the people.*" It fully and implicitly relies upon them, and if that reliance fails, then this experiment of self-government must be regarded as a failure.

3. If the right to direct the course of instruction and the books to be used is given, the right to enforce obedience to the determining power must manifestly exist, or the determination will be ineffectual. It would be worse than idle to grant this power to direct, if any one can set at naught the action of the committee.

The committee may enforce obedience to all regulations within the scope of their authority. If they may select a book they may require the use of the book selected. If the plaintiff may refuse reading in one book she may in another, unless for some cause she is exempted from the duty of obedience. If she may decline to obey one requirement, rightfully made, then she may another, and the discipline of the school is at an end. It is for the committee to determine what misconduct requires expulsion. That is expressly left to their determination. "It may be urged," says SHAW, C. J., in *Sherman* v. *Charlestown,* 8 Cush. 165, "that if this power exists in school committees, they may exercise it arbitrarily and unjustly; but the answer is, that such a power must exist somewhere, that all power conferred for good may be abused to wrong uses; but this power is intrusted to bodies under all the responsibilities which can bind any public officers to the faithful performance of duty in such a trust. They are chosen by their fellow-citizens for their supposed capacity, impartiality and fitness, and they are liable to be removed by the same constituents."

It is not necessary to consider whether they acted wisely or not; if they acted in good faith in the exercise of their duty, they must be regarded as most clearly within the principles established in *Stephenson* v. *Hall,* 14 Barb. 222; *Dinsman* v. *Wilkes,* 7 How. 89.

4. The plaintiff seeks to avoid those conclusions by deny-ing that the book selected was one in which she could be constitutionally compelled to read upon pain of expulsion, in case of her refusal to obey. She claims exemption from the general duty of obedience, from the particular charac-ter of the book in which she was required to read. The question therefore, is whether, if the Legislature should by statute direct any version of the Bible to be read in schools, and should impose the penalty of expulsion, in the case of refusal, such statute would be a violation of the constitu-tion.

The use of the Bible as a reading book is not prohibited by any express language of the constitution.

Is its use for that purpose in opposition to the spirit and intention of that instrument?

If it be not, if it be a book which may be directed within the spirit and meaning of the constitution, to be used in schools, it is obvious that its use may be required of all; for a regulation which any scholar may violate with impu-nity would cease to have the force and effect of a rule.

The case finds that the superintending school committee directed that the English Protestant version should be used in all the public schools of Ellsworth, and that all who were of sufficient capacity to read therein should be required to read that version in school. This is the requisition of which complaint is made.

The common schools are not for the purpose of instruction in the theological doctrines of any religion, or of any sect. The State regards no one sect as superior to any other — and no theological views as peculiarly entitled to precedence. It is no part of the duty of the instructor to give theological instruction — and if the peculiar tenet of any particular sect were so taught it would furnish a well grounded cause of complaint on the part of those, who entertained different or opposing religious sentiments.

But the instruction here given is not in fact, and is not alleged to have been, in articles of faith. No theological

doctrines were taught. The creed of no sect was affirmed or denied. The truth or falsehood of the book in which the scholars were required to read, was not asserted. No interference by way of instruction, with the views of the scholars, whether derived from parental or sacerdotal authority, is shown.

The Bible was used merely as a book in which instruction in reading was given. But reading the Bible is no more an interference with religious belief, than would reading the mythology of Greece or Rome be regarded as interfering with religious belief or an affirmance of the pagan creeds. A chapter in the Koran might be read, yet it would not be an affirmation of the truth of Mahomedanism, or an interference with religious faith. The Bible was used merely as a reading book, and for the information contained in it, as the Koran might be, and not for religious instruction; if suitable for that, it was suitable for the purpose for which it was selected. No one was required to believe or punished for disbelief, either in its inspiration or want of inspiration; in the fidelity of the translation or its inaccuracy — or in any set of doctrines deducible or not deducible therefrom.

It is made, by c. 193, § 2, art. 7, the duty of all the instructors of youth whether in public or private institutions, "to take diligent care and exert their best endeavors, to impress on the minds of children and youth committed to their care and instruction the principles of morality and justice, and a sacred regard to truth; love to their country, humanity and universal benevolence; sobriety, industry and frugality; chastity, moderation, and temperance; and all other virtues, which are the ornaments of human society." It will not be insisted that this duty, so beautifully set forth, is other than in entire conformity with the constitution. Neither is it claimed that the Bible, in any of its translations, is adverse to sound morality or those virtues here designated as proper to be inculcated.

The plaintiff, indeed, makes no objection to the Bible as a book which she may not rightfully be required to read in

schools, but only to a particular translation. Indeed, the report finds that she was willing to read from the Douay version. It is apparent that it is highly desirable that in the same class there should be an uniformity of books to be used. But if the book is proper, if consonant to the soundest principles of morality, then is there any translation which can be justly deemed adverse to those principles? Does the version in which the plaintiff was willing to read contravene sound morality, even in the judgment of the defendants? Does the version which the defendants required to be read, conflict, even in the opinion of the plaintiff, with pure morality? If not, then the book itself, alike in the judgment of the plaintiff and the defendants, is one which may be read without reasonable grounds of objection in schools.

But while the book itself would seem to be unobjectionable, the controversy arises merely from a difference between the version directed by the defendants to be used, and that in which the plaintiff was willing to read.

It is the remark of a profound scholar, that there is hardly a sentence in any of the best English authors, about the meaning of which, if a question of property were to depend upon its construction, a doubt might not be raised. The unavoidable difficulties of language, its necessary and irremediable imperfections, are enhanced, in this case, from the circumstance that the Bible was first written in a foreign tongue. The readings of the various canonical books are almost innumerable, amounting in the New Testament alone to above fifty thousand, the inevitable result of transcription by individuals at different and successive times. They consist, for the most part, in the omission or insertion of words, in transpositions, or in differences of termination, where the same word is used. Although the various readings are thus numerous, yet but in few instances do they affect the meaning. There may be a difference in the authority given to different readings, so that probably no two critical scholars could be found who would agree upon an

entire identity of text. Besides variation of the text, even when that is identical, the meanings to be attached to the same word are frequently numerous, variant and dependent upon its position in the text, and its connection with what precedes and follows. Which, therefore, may in fact be the more accurate of various versions is a question of scholarly erudition in respect to which there will be a difference of opinion resulting from the different education and prejudices of individuals, as well as from the intrinsic and ineradicable difficulties of the subject.

When the translation is accomplished, and an agreement as to the English word is established, the meaning is still a matter of conflict, as is evidenced by the dogmatic theology of numerous and discordant sects, who, all resorting to the same common source of instruction, differ so essentially in the meaning to be given to its language.

Such being the case, all that is shown by the selection of one version is simply a preference of one over another, when there must from necessity be a difference of opinion. But in case of numerous translations of a work in itself unobjectionable, a preference may be expressed and acted upon without infringing upon the just rights of others.

All that is done is, that a committee for the time being prefer one to another. Both, undoubtedly, may be used in schools, or both may be excluded therefrom. Or, as uniformity may be desirable, one committee may direct the use of one, and another of a different version, according to their respective views of expediency. The catholics deny the accuracy of portions of the version commonly used by protestants. The protestants assert that in some respects the Douay version is erroneous. Different sects of the protestants express dissatisfaction, in some instances, with both. The adoption of one is no authoritative sanction of purity of text or accuracy of translation. School committees could rarely be found competent to settle those questions. It is simply the adoption of a particular version of a work, which from the idiomatic English of the translation,

and the sublime morality of its teachings, furnishes the best illustration which the language affords of pure English undefiled, and is best fitted to strengthen the morals and promote the virtues which adorn and dignify social life.

The controversy seems to resolve itself into the inquiry whether there is any thing in the constitution, which in case of different translations of a work fitting and proper for schools, forbids the requirement of the use of a particular version as a reading book by those who may conscientiously believe it to have been, in some respects, erroneously made. If so, it is obvious that the particular version must be entirely prohibited, for if the plaintiff has a constitutional right to be absolved from a regulation of the school requiring its reading, because it is in conflict with her religious conscientious belief, it is not easy to perceive why she has not an equally valid ground of objection to hearing it read. If so, as others may have their consciences, it follows, not merely that no translation of the Bible can be used, but that no book can be used which may contain any proposition opposed to the conscientious belief of any scholar.

The language of the constitution, upon which the learned counsel for the plaintiff relies, in support of the grounds by him taken in argument, is found in art. 1, § 3 — and is in these words : —

" All men have a natural and unalienable right to *worship Almighty God* according to the dictates of their own consciences, and no one shall be *hurt, molested* or *restrained* in his person, liberty or estate, *for worshiping God* in the manner and season most agreeable to the dictates of his own conscience, nor for his religious professions or sentiments, provided he does not disturb the public peace, nor obstruct others in their religious worship ; and all persons demeaning themselves peaceably, as good members of the State, shall be equally under the protection of the laws, and no *subordination nor preference* of any sect or denomination to another shall ever be established by law, nor shall any

*religious tests* be required as a qualification for any office or trust under this State."

The clause in the constitution upon which reliance is specially placed, is, that "no one shall be *hurt, molested* or *restrained* in his person, liberty or estate, for worshiping God in the manner and season most agreeable to the dictates of his own conscience, nor for his *religious professions* or *sentiments*, provided he does not disturb the public peace, nor obstruct others in their religious worship." The object of this clause was to protect all — the Mahomedan and the Brahmin, the Jew and the Christian, of every diversity of religious opinion, in the unrestrained liberty of worship and religious profession, provided the public peace should not thereby be endangered nor the worship of others obstructed. It was to prevent pains and penalties, imprisonment or the deprivation of social or political rights, being imposed as a penalty for religious professions and opinions.

It was held by the Supreme Court of Massachusetts, in *Thurston* v. *Whitney*, 2 Cush. 104, that the rejection of a witness as incompetent, by reason of his want of religious belief, was not a violation of the second article of the Bill of Rights, which is similar in its language to the constitutional provisions in this State, to which reference has been made. "It was," says WILDE, J., "intended to prevent persecutions by punishing any one for his religious opinions, however erroneous they might be."

Another clause in the constitution, upon which reliance is placed, is, " that no *subordination nor preference* of any sect or denomination to another shall ever be established by law."

This clause obviously provides for the equality of all sects, and forbids the preference of one over another. It is insisted that here is a preference by law. This relates to an. Act of the Legislature, which shall establish the preference of one sect and the subordination of others. The selection of a school book is no preference within this clause. The

choice is left entirely to the popular will. One set of town officers may make one selection, and another may make an entirely different one. The most unrestrained liberty of choice is given. It would be a novel doctrine that learning to read out of one book rather than another, or out of one translation rather than another, of a book conceded to be proper, was a legislative preference of one sect to another, when all that is alleged is, that the art of reading only was taught, and that without the slightest indication of or instruction in theological doctrines.

If this were to be regarded as a legislative preference, much more must those laws, by which the Sabbath is established as a day of rest, in which labor, except for necessity, is prohibited being done, be regarded as a subordination of the religious views of all other sects to those holding that day sacred. Indeed this very objection has, in many States, been raised against the constitutionality of such laws. The case of *Specht* v. *The Commonwealth*, 8 Barr. 312, involved the question whether the members of a sect, who conscientiously observe the seventh day of the week as the Christian Sabbath, are, upon conviction for violating the first day of the week, or Sunday, by working or pursuing any worldly employment, amenable to the penalties inflicted by the Act of the Assembly. In answer to the position that it exalts the religious belief of certain sects over that of others, BELL, J., says: "though it may have been a motive with the law makers to prohibit the profanation of a day regarded by them as sacred — it is not perceived how this fact can vitally affect the question at issue. All agree that to the well-being of society periods of rest are necessary. To be productive of the required advantage, these periods must recur at stated intervals, so that the mass of which the community is composed, may enjoy respite from labor at the same time. They may be established by common consent, or, as is conceded, the legislative power of the State may, without impropriety, interfere to fix the time of their stated return, and enforce obedience to their direction. When this

happens, some one day must be selected, and it has been said that the round of the week presents none, which being preferred might not be regarded as favoring some one religious sect. In a Christian community, where a very large majority of the people celebrate the first day of the week as their chosen period of rest from labor, it is not surprising that that day should have received the legislative sanction, &c. Yet this does not change the character of the enactment. It is still essentially a civil institution, made for the government of man, as a member of society, and obedience to it may properly be enforced by penal sanctions." In South Carolina the question arose, whether Jews could enjoy immunity from the law prohibiting sales on Sunday. This question was very fully considered in *Charleston* v. *Benjamin*, 1 Law Rep. N. S. 7, and it was there held that the right of appointing the Sabbath, as a day of rest from labor, must be regarded as a municipal institution, conducive to civil expedience. "This," says O'Neal, J., "is a mere police or municipal regulation. If the Israelite were allowed to make the objection, that he could not be constitutionally restrained from pursuing public business on Sunday, the infidel would say, all days are alike to me, and therefore I will at all times pursue my business. Such an assumption is so preposterous, that no one would tolerate it." The same views were held in *Shaw* v. *State*, 5 Eng. 262, and in *Commonwealth* v. *Wolfe*, 3 S. & R. 48. It was held by the Supreme Court of Ohio, in *Bloom* v. *Richards*, 2 Warden, 388, that the statute prohibiting labor on the Sabbath, is to be regarded as a mere municipal or police regulation, the validity of which is neither weakened nor strengthened by the fact that the day of rest it enjoins is the Sabbath. By recurring to the debates of the convention by which the constitution of this State was formed, it will be perceived that the establishment of the Sabbath was regarded simply as a civil institution; while it was conceded that it was within the general powers of the Legislature to select a day of rest, on which labor and recreation might be prohibited, it was

denied that they had any right to prescribe this as a day of *worship*, to those who might believe another to be the proper Sabbath. Perley's Debates, 74.

The Jews and the seventh day Baptists regarding Saturday as divinely set apart for rest, find legal impediments to labor on the Christian Sabbath, when they believe it may be lawfully done, and conscientious scruples to their laboring on the preceding day, so that between the law and their consciences they are compelled to abstain from labor on both days; yet this *is* not regarded as hurting, molesting or restraining them in their persons, liberties or estates, within the meaning or constitutional prohibitions similar to our own; nor as creating a subordination or preference of one sect over another. Much more, then, should not the selection of the Bible as a book in which reading only is to be taught, be regarded as in the slightest degree in conflict with this portion of the bill of rights.

But the objection is urged that this is the creation of a religious test. But no requirements as to belief are made *essential to entitle a* scholar to the benefits of the common schools of the State. He may be a Jew or Mahomedan, a catholic or protestant, he may believe much or little, according to the instructions received at home — and for no such cause is he to be deprived of instruction. The State opposes no test or other impediment for the purpose of debarring any one from the public schools.

But the claim of the plaintiff is much more liable to the exception that it is creating the subordination or preference of one sect or denomination over another. Her claim to be exempted from a general regulation of the school rests entirely on her religious belief, and is to the extent that the choice of reading books shall be in *entire subordination to her faith, and because it is her faith.* The preference is manifestly given, if, in the selection to be made, the defendants were bound to defer to the doctrines and authority and teachings of the sect of which she is a member. The right of negation is, in its operation, equivalent to that of

Donahoe v. Richards.

proposing and establishing. The right of one sect to interdict or expurgate, would place all schools in subordination to the sect interdicting or expurgating.

If the claim is, that the sect of which the child is a member has the right of interdiction, and that any book is to be banished because under the ban of her church, then the preference is practically given to such church, and the very mischief complained of, is inflicted on others.

If Locke and Bacon and Milton and Swift are to be stricken from the list of authors which may be read in schools, because the authorities of one sect may have placed them among the list of heretical writers whose works it neither permits to be printed, nor sold, nor read, then the right of sectarian interference in the selection of books is at once yielded, and no books can be read, to the reading of which it may not assent. Because Galileo and Copernicus and Newton may chance to be found in some prohibitory index, is that a reason why the youth of the country should be educated in ignorance of the scientific teachings of those great philosophers? If the Bible, or a particular version of it, may be excluded from schools, because its reading may be opposed to the teachings of the authorities of any church, the same result may ensue as to any other book. If one sect may object, the same right must be granted to others. This would give the authorities of any sect the right to annul any regulation of the constituted authorities of the State, as to the course of study and the books to be used. It is placing the legislation of the State, in the matter of education, at once and forever, in subordination to the decrees and the teachings of any and all sects, when their members conscientiously believe such teachings. It at once surrenders the power of the State to a government not emanating from the people, nor recognized by the constitution.

The case finds, that the authorities of the sect of which the plaintiff is a member, regard it sinful to read in the version directed by the defendants — but if a book is to be

excluded for that cause, in one instance, it must be in all, and the use of books would be made to depend not upon the judgment of those to whom the law entrusts their selection, but upon that of the authorities of a church, so that each sect would have precedence as a sect and for that cause.

From the report, it appears that the plaintiff, from conscientious religious scruples, refused to read in the version designated by the defendants as the one to be used, and that she and her father both regarded it as sinful so to do, both having been so taught by the authorities of the church of which they are members.

As the suit is by the child, as her rights only are alleged to be violated, the conscientious religious views of the father are not involved in the determination of this suit. He is no party to it, for the purpose of obtaining compensation, nor is it brought on account of any infraction of his rights. The real inquiry is, whether any book opposed to the real or asserted conscientious views of a scholar can be legally directed to be used as a school book, in which such scholar can be required to read. The claim, on the part of the plaintiff, is that each and every scholar may set up its own conscience as over and above the law. It is the claim of an exemption from a general law because it may conflict with the particular conscience.

The action being by the scholar, the invasion being of its rights, it is apparent, that if the fact of opposition to conscience on the part of a child affords a well-grounded reason for its exemption from the general rules of the school — that it may operate to the exclusion of books to an indefinite extent. As the existence of conscientious scruples as to the reading of a book can only *be known from the assertion of the child, its mere assertion must suffice for the exclusion of any book* in the reading or in the hearing of which it may *allege* a wrong to be done to its religious conscience. The claim, so far as it may rest on conscience, is a claim to annul any regulation of the State, made by its

constituted authorities. As a right existing on the part of one child, it is equally a right belonging to all. As it relates to one book, so it may apply to another — whether relating to science or to morals. Error may reach the understanding by the hearing equally as by vision — by the ear as by the eye. As the child may object to reading any book, so it may equally object to hearing it read, for the same cause — and thus the power of selection of books is withdrawn from those to whom the law intrusts it, and by the right of negation is transferred to the scholars.

The right as claimed, undermines the power of the State. It is, that the will of the majority shall bow to the conscience of the minority, or of one. If the several consciences of the scholars are permitted to contravene, obstruct or annul the action of the State, then power ceases to reside in majorities, and is transferred to minorities. Nor is this all. While the laws are made and established by those of full age, the right of obstruction, of interdiction, is given to any and all children, of however so immature an age or judgment.

Neither can the committee select books, for they do not know all existing, and they cannot foreknow, all contingent and prospective scruples of conscience. If the fact that a book or some portions of it, is not in accordance with the conscientious scruples of some scholar, makes the requirement of its use by such scholar, or the permission of its use by another to whom it is unobjectionable in the presence of the dissenting scholar, the unconstitutional exercise of power, then the constitutional selection of books becomes a variable quantity, dependent on the present and temporary conscience of every scholar in every school.

But while the constitution recognizes "the goodness of the Sovereign Ruler of the Universe," it does not recognize the superiority of any form of religion or of any sect or denomination. It knows no religion, nor form of religion as such, as having any binding force over its citizens, against its will constitutionally expressed. It regards the Pagan

and the Mormon, the Brahmin and the Jew, the Swedenborgian and the Budhist, the Catholic and the Quaker, as all possessing equal rights. The decrees of a council, or the decisions of the Ulema, are alike powerless before its will. It acknowledges no government external to itself—no ecclesiastical or other organization as having power over its citizens, or any right to dispense with the obligation of its laws. Its doctrine is the supremacy of the people, and that " all free governments are founded on their authority, and instituted for their benefit."

The Legislature establishes general rules for the guidance of its citizens. It does not necessarily follow that they are unconstitutional, nor that a citizen is to be legally absolved from obedience, because they may conflict with his conscientious views of religious duty or right. To allow this would be to subordinate the State to the individual conscience. A law is not unconstitutional, because it may prohibit what a citizen may conscientiously think right, or require what he may conscientiously think wrong. The State is governed by its own views of duty. The right or wrong of the State, is the right or wrong as declared by legislative Acts constitutionally passed. It may pass laws against polygamy, yet the Mormon or Mahomedan cannot claim an exemption from their operation, or freedom from punishment imposed upon their violation, because they may believe, however conscientiously, that it is an institution founded on the soundest political wisdom, and resting on the sure foundation of inspired revelation. It may establish a day of rest, as a civil institution, though the effect of it may be to deprive the Jew of one sixth of his time, for purposes of labor or of business.

The claim of exemption from the operation of a general law, as a matter of right, has received the consideration of Courts of the greatest learning and ability. The case of *Simons, Ex.* v. *Gratz,* 2 Penn. 412, involved the question whether the affidavit of a Jew, who was one of the plaintiffs, that he could not appear in Court on Saturday from

Donahoe v. Richards.

conscientious scruples, that day being his Sabbath, and that the cause could not be tried without his assistance, presented a ground for the continuance of the case. In delivering the opinion of the Court, GIBSON, C. J., says, "the religious scruples of persons concerned in the administration of justice will receive all the indulgence that is compatible with the business of government, and had circumstances permitted, this case would not have been ordered to trial on the Jewish Sabbath. But when a continuance for conscience's sake is claimed as a matter of right, the matter assumes a different aspect. It has never been held, except · in a single instance, that the course of justice may be obstructed by any scruple or obligation whatever. The sacrifice that ensues from an opposition of conscientious objection to the performance of a civil duty, ought, one would think, to be on the part of him whose moral or religious idiosyncracy makes it necessary; else a denial of the lawfulness of capital punishment would exempt a witness from testifying to facts that might serve to convict a prisoner of murder, or to say nothing of the other functionaries of the law, excuse a sheriff for refusing to execute one capitally convicted. This is an exemption which no one would claim, yet it would inevitably follow from the principle insisted on here." In *Commonwealth* v. *Lesher*, 17 S. & R. 155, the question arose whether it was a good cause of challenge to a juror, by the Commonwealth in a capital case, that he has conscientious scruples on the subject of capital punishment. "The question," remarks GIBSON, C. J., "has been argued in part as if it stood on a challenge by the juror himself. It would be more difficult to sustain such a challenge than that which has been made by the Attorney General. It is declared in the constitution, (art. 9, § 3,) that 'no human authority can in any way control or interfere with the rights of conscience.' But what are those rights? Simply a right to worship the Supreme Being according to the dictates of the heart; to adopt any creed or hold any opinion whatever on the subject of religion, and to do or forbear to do, any act the doing or forbear-

ing of which is not prejudicial to the public weal. But *salus populi suprema lex* is a maxim of universal application.; and when liberty of conscience would interfere with the paramount rights of the public, it ought to be restrained. Even Mr. Jefferson, than whom a more resolute champion of liberty never lived, claims no indulgence for any thing that is detrimental to society, though it springs from a religious belief or no belief at all. His position is, that civil government is instituted only for temporal objects, and that spiritual matters are legitimate subjects of civil cognizance no farther than they may stand in the way of those objects. He denies the right of society to interfere only when society is a party in interest, the question and the consequence being between the man and his Creator. But as far as the interests of society are involved, its right to interfere on the principle of self-preservation is not disputed. And this right is resolvable into the most absolute necessity, for were the laws dispensed with whenever they happen to come into *collision* with some supposed religious obligation, government would be perpetually falling short of the exigency. There are few things, however simple, that stand indifferent in the view of all sects into which the Christian world is divided." In *Stansbury* v. *Marks*, 2 Dall. 213, a Jew, who refused to be sworn as a witness, in a cause tried on a Saturday, because it was his Sabbath, was fined by the Court.. In *U. S.* v. *Coolidge*, 2 Gall. 384, one who was not a Quaker, but who refused to be sworn on the ground of conscientious scruples, was in consequence of such refusal committed as for a contempt. The conscientious belief of religious duty furnishes no legal defence to the doing or refusing to do what the State within its constitutional authority may require. If it were so, the obligations of a statute would depend not upon the will of the State, but upon its conformity with the religious convictions of its members. When a conflict arises, as it may, between the requirements of law and the obligations of conscience, each man must determine his course of action according to his views of duty and of right.

Donahoe *v.* Richards.

The claim on the part of the plaintiff has been argued as a question of strict right. As such, without reference to what may be wise or expedient, it has been considered and determined by the Court.

The trust conferred upon those who have the superintendence of our public schools is hardly inferior in importance to that of the administration of the government. Indeed, the government itself depends in no slight degree upon the education of those by whom it is hereafter to be controlled. Amid the various and conflicting differences on moral, political and religious subjects, there is need of mutual charity and forbearance — of mutual concession and compromise. Large masses of foreign population are among us, weak in the midst of our strength. Mere citizenship is of no avail, unless they imbibe the liberal spirit of our laws and institutions, unless they become citizens in fact as well as in name. In no other way can the process of assimilation be so readily and thoroughly accomplished as through the medium of the public schools, which are alike open to the children of the rich and the poor, of the stranger and the citizen. It is the duty of those to whom this sacred trust is confided, to discharge it with magnanimous liberality and Christian kindness. While the law should reign supreme, and obedience to its commands should ever be required, yet in the establishment of the law which is to control, there is no principle of wider application and of higher wisdom; commending itself alike to the broad field of legislative, and the more restricted one of municipal action — to those who enact the law, as well as those who, enjoying its benefits and privileges, should yield to its requirements, than a precept which is found with almost verbal identity in the versions which, from education and association, are endeared to the respective parties in litigation, " All things whatsoever ye would that men should do to you, do ye even so to them, for this is the law and the prophets."

*Plaintiff nonsuit.*

SHEPLEY, C. J., and TENNEY and HOWARD, J. J., concurred.