THE PEOPLE *ex rel.* Jeremiah Ring *et al.* Plaintiffs in Error, *vs.* THE BOARD OF EDUCATION OF DISTRICT 24, etc., Defendant in Error.

*Opinion filed June 29, 1910.*

1. CONSTITUTIONAL LAW—*free enjoyment of religious worship includes freedom not to worship.* Section 3 of article 2 of the constitution, guaranteeing "the free exercise and enjoyment of religious profession and worship, without discrimination," includes freedom from being compelled to join in any religious worship.

2. SAME—*children attending public school cannot be compelled to join in religious worship.* The reading of the Bible in the public schools, the singing of hymns and the repeating of the Lord's Prayer in concert, during which time the pupils are required to rise, bow their heads and fold their hands, constitutes worship within the meaning of the constitution, and pupils cannot be compelled to join therein against their own or their parents' wishes.

3. SAME—*the constitution forbids giving sectarian instruction in public schools.* The provision of section 3 of article 8 of the constitution forbidding the use of public school funds in aid of any sectarian purpose is a prohibition of the giving of sectarian instruction in the public schools.

4. SAME—*reading of the Bible in public schools constitutes sectarian instruction.* The reading of the Bible in the public schools constitutes the giving of sectarian instruction, within the meaning of section 3 of article 8 of the constitution.

HAND and CARTWRIGHT, JJ., dissenting.

WRIT OF ERROR to the Circuit Court of Scott county; the Hon. R. B. SHIRLEY, Judge, presiding.

THOMAS F. FERNS, for plaintiffs in error:

The reading of passages from the King James version of the Bible, offering up the Lord's Prayer as it is found in said version, and the singing of sacred hymns, as set out in the second amended petition herein, in the public schools during school hours, are forbidden by the constitution and laws of this State. *State* v. *District Board,* 76 Wis. 177; *State* v. *Scheve,* 65 Neb. 853; *Board of Education* v. *Minor,* 23 Ohio St. 211.

J. M. RIGGS, and J. A. WARREN, for defendant in error:

It is not a violation of the constitution of this State to let a school house be used for religious meetings, even for regular meetings, by a religious denomination. *Nichols* v. *School Directors,* 93 Ill. 61.

A board of school directors adopted a rule providing that the teacher might read every morning, for fifteen minutes, a chapter from the King James version of the Bible, during which time each pupil was required to lay aside his books. The court held the expulsion of a Catholic pupil for refusal to comply with the rule furnished no cause of action against the board of directors who expelled him. *McCormick* v. *Burt,* 95 Ill. 263.

The saying of the Angelus prayer by teacher and pupils at the closing of school was held not unlawful in *Millard* v. *Board of Education,* 121 Ill. 297.

Reading the Bible, and especially the New Testament, without note or comment, is not sectarian. *Vidal* v. *Girard's Exrs.* 2 How. 127.

The reading of the Protestant version of the Bible as a book used in teaching reading in the public schools is not an interference with religious belief. *Donahoe* v. *Richards,* 38 Me. 379; *Spiller* v. *Woburn,* 12 Allen, 127.

Reading a book in the public schools entitled "Readings from the Bible," which book the school board had adopted as one of the reading books in the school, was held not a violation of the constitution. *Pfeiffer* v. *Board of Education,* 118 Mich. 560.

A teacher read each morning from the Bible, repeated the Lord's Prayer and sang religious songs, and that was held not unconstitutional. *Moore* v. *Monroe,* 64 Iowa, 367.

Repeating the Lord's Prayer and the Twenty-third Psalm, and singing, as the morning exercises in school, was held not a violation of the constitution. *Billard* v. *Board of Education,* 69 Kan. 53.

The custom in a public school of repeating the Lord's Prayer as found in the King James version of the Bible and reading selections from said Bible is not a violation of any of the rights of a Catholic patron of the school. *Hackett* v. *Brookville School,* 120 Ky. 608.

It was held not a violation of the provisions of the constitution of the State of Texas to read in the public schools from the King James version of the Bible. The Texas constitutional provision is similar to that in this State. *Church* v. *Bullock,* 109 S. W. Rep. 115.

This court has held it is not unreasonable to read the Scriptures in school, and has, at least in part, repudiated the Wisconsin doctrine. *North* v. *Trustees,* 137 Ill. 296.

A rule of a school board requiring a portion of the Bible to be read as an opening exercise of the school does not violate the constitutional provision "that no person shall be compelled to attend, erect or support any place of worship or maintain any form of worship against his consent." *Nessle* v. *Hum,* 1 Ohio Nisi Prius, 140.

The constitutionality of the practice of opening school exercises with reading from the Scriptures has been generally upheld.   25 Am. & Eng. Ency. of Law, (2d ed.) 30, 31.

The guaranty of religious liberty and freedom of conscience does not prohibit the use of the Bible in public schools or devotional exercises, provided the pupil is not required to join.   8 Cyc. 884.

Mr. JUSTICE DUNN delivered the opinion of the court:

The relators filed a petition for a writ of *mandamus* to require the defendant in error to cause to be discontinued as exercises in the public schools the reading of the Bible, the singing of hymns and the repeating of the Lord's Prayer. This writ of error is brought to reverse a judgment dismissing the petition upon sustaining a demurrer thereto.

The petition avers that the relators are residents of, and two of them tax-payers in, school district No. 24, township No. 14, range 12, Scott county, Illinois; that certain free public schools are maintained in said school district in accordance with the statutes of Illinois, and that relators are parents of children between the ages of seven and fourteen years who are entitled to the benefits of said schools and are attending said schools for the purpose of receiving instruction therein; that certain teachers employed in said schools read to the pupils, including the children of relators, every day school is in session, during school hours, portions selected by the teachers from the King James version of the Bible; that relators and their children are members of the Roman Catholic Church and believe in its doctrines, faith and forms of worship; that said church believes the King James version of the Bible to be an incorrect and incomplete translation and that it disapproves of its being read as a devotional exercise; that in addition to reading the Bible, the Lord's Prayer as found in the King James version is recited audibly in concert under direction of the teachers, and that said prayer is in different words from that taught by the Roman Catholic Church; that during school hours what are called "sacred hymns" are sung in concert by the pupils, who are required to stand while singing, one of said hymns, called "Grace Enough For Me," being set out in full in the petition; that during the reading from the Bible and the reciting of the Lord's Prayer the pupils are required to rise in their seats, fold their hands and bow their heads, and from time to time certain pupils have been asked to explain the meaning of certain passages of Scripture read; that the said exercises are in violation of the constitution of this State and of the United States, because they are devotional, sectarian exercises and violate the right of the free exercise and enjoyment of religious profession and worship; that there is no parochial or private school in the county of Scott to which the relators could send their children for

245—22

instruction; that the laws of Illinois make it compulsory upon them to send their children to school, and that to require said children to be sent to the public school aforesaid requires them to attend a place of worship against the consent of the children and their parents.

The first amendment to the Federal constitution prohibits Congress from making any law respecting an establishment of religion or prohibiting the free exercise thereof. That instrument contains no restriction in this respect upon the legislatures of the States, which are thus left free to enact such laws in respect to religion as they may deem proper, restrained only by the limitations of the respective State constitutions. (2 Story on Constitution, sec. 1878; *Permoli* v. *New Orleans,* 3 How. 589; *Reynolds* v. *United States,* 98 U. S. 145.) Our State constitution guarantees "the free exercise and enjoyment of religious profession and worship, without discrimination." (Const. art. 2, sec. 3.) Section 3 of article 8 prohibits the appropriation of any public fund in aid of any church or sectarian purpose, or for the support of any school, academy, seminary, college, university or other literary or scientific institution controlled by any church or sectarian denomination, or the donation of money by the State to any church or for any sectarian purpose.

The exercises mentioned in the petition constitute worship. They are the ordinary forms of worship usually practiced by Protestant Christian denominations. Their compulsory performance would be a violation of the constitutional guaranty of the free exercise and enjoyment of religious profession and worship. One does not enjoy the free exercise of religious worship who is compelled to join in any form of religious worship. "Worship" is defined by Webster as follows: "4. The act of paying divine honors to the Supreme Being; religious reverence and homage; adoration paid to God or a being viewed as God. * * * "The worship of God is an eminent part of religion, and

prayer is a chief part of religious worship.'" Worcester's definition is: "3. Adoration; a religious act of reverence; honor paid to the Supreme Being or by heathen nations to their deities. Worship consists in the performance of all those external acts and the observance of all those rites and ceremonies in which men engage with the professed and sole view of honoring God." We know of no technical definition of the word by any court. It includes prayer, praise, thanksgiving. In the ordinary church meeting the congregation is regarded as engaged in religious worship while listening to the sermon, reading the Holy Scriptures or hearing them read, or engaged in the singing. Devotional, religious exercises constitute worship. Prayer is a chief part of worship. The petition avers that the Lord's Prayer is recited in concert under the direction of the teachers, during which the pupils are required to rise in their seats, bow their heads and fold their hands. Prayer is always worship. Reading the Bible and singing may be worship. The song "Grace Enough For Me," set out in the petition, is a devotional hymn of religious joy and of praise and thanksgiving for the flood of grace flowing from the cross on Calvary. Praise is defined by Webster as "especially the joyful tribute of gratitude or homage rendered to the Divine Being; the act of glorifying or extolling the Creator; worship, often in song, in distinction from petition or confession." If these exercises of reading the Bible, joining in prayer and in the singing of hymns were performed in a church there would be no doubt of their religious character, and that character is not changed by the place of their performance. If the petitioners' children are required to join in the acts of worship, as alleged in the petition, against their consent and against the wishes of their parents, they are deprived of the freedom of religious worship guaranteed to them by the constitution. The wrong arises, not out of the particular version of the Bible or form of prayer used,—whether that found in the Douay or

the King James version,—or the particular songs sung, but out of the compulsion to join in any form of worship. The free enjoyment of religious worship includes freedom not to worship.

A decision that the exercises complained of constitute a violation of the guaranty of freedom of worship does not, however, dispose of the questions arising in this case. It is further contended that the reading of the Bible in the schools constitutes sectarian instruction, and that thereby that provision of the constitution is also violated which prohibits the payment from any public fund of anything in aid of any sectarian purpose. The public schools are supported by taxation, and if sectarian instruction should be permitted in them, the money used in their support would be used in aid of a sectarian purpose. The prohibition of such use of public funds is therefore a prohibition of the giving of sectarian instruction in the public schools.

Is the reading of the Bible in the public schools sectarian instruction? Religion has reference to man's relation to divinity; to the moral obligation of reverence and worship, obedience and submission. It is defined by Webster as the recognition of God as an object of worship, love and obedience; right feeling toward God, as rightly apprehended. It deals with the soul. Its phenomena are spiritual. It controls external things. Things external cannot control it. Religion cannot be burned out of a man; it can not be scourged into him, "for as he thinketh in his heart so is he." His own reason and feeling are, of necessity, his only guide. He cannot, if he would, worship a God in whom he does not believe, though he may be compelled to go through the form of doing so. In the very nature of things, therefore, "religion, or the duty we owe to the Creator," is not within the cognizance of civil government, as was declared by James Madison in 1784 in his remonstrance against a bill pending in the Virginia legislature "establishing provision for teachers of the Christian religion." Not

only was that bill defeated, but another "for establishing religious freedom," drafted by Thomas Jefferson, was passed, (12 Hen. Stat. 84,) which, after reciting that "to suffer the civil magistrate to intrude his powers into the field of opinion and to restrain the profession or propagation of principles on supposition of their ill tendency is a dangerous fallacy which at once destroys all religious liberty," declared that "it is time enough, for the rightful purposes of civil government, for its officers to interfere when principles break out into overt acts against peace and good order." "In these two sentences," says the Supreme Court of the United States, "is found the true distinction between what properly belongs to the church and what to the State." *Reynolds* v. *United States, supra.*

The practical recognition of entire individual freedom of thought and action in reference to matters of religion has not, however, always been conceded. In fact, most of the governments of the world have claimed and have exercised the right to interfere with and direct the religious profession and worship of their citizens. A government without a State religion was hardly known before the adoption of our Federal constitution, and long after that event, in some of the States, ministers of the gospel were lawfully paid out of public funds raised by general taxation for that purpose. Even now there exist constitutional provisions authorizing not only such payment, but also religious tests with reference to qualification for office or competency as a witness or juror, as in New Hampshire, under whose constitution the legislature may, authorize subordinate municipalities to provide at their own expense for the support of Protestant ministers; (N. H. Const., Bill of Rights, art. 6; 4 Thorpe's American Charters, Constitutions and Organic Laws, 2494;) Pennsylvania and Tennessee, where a belief in God and a future state of rewards and punishments is a constitutional qualification for office; (Pa. Const. art. 1, sec. 4; 5 Thorpe, 3121; Tenn. Const. art. 9,

sec. 2; 6 Thorpe, 3465;) Arkansas, whose constitution declares ineligible to office and incompetent as a witness any person who denies the being of a god; (Ark. Const. art. 19, sec. 1; 1 Thorpe, 365;) and Maryland, whose constitution prescribes a belief in God and in a dispensation of rewards and punishments as essential to competency as a witness or juror. (Md. Const., Declaration of Rights, sec. 36; 3 Thorpe, 1782.)

The Puritan in New England and the Cavalier in Virginia each established his own church and taxed the people for its support. Non-conformists were discriminated against and in some cases were oppressed and persecuted or driven out. The Pilgrims, who fled from the oppression of the majority at home, made their religion a part of their civil government,—not religion, but *their* religion. In the new country, being themselves in the majority, they became oppressors of the minority, which refused to conform to the religion preferred by the laws which they enacted. Quakers were banished from Massachusetts, and Roger Williams was driven out of the colony to found the new colony of Providence, whose government should have authority "only in civil things." By this express limitation of the authority of the magistrate to civil things was the fundamental principle of the separation of church and State then and there for the first time definitely declared.

The ordinance of 1787 for the government of the Northwest Territory declared that "religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." This provision is no longer in force, having been superseded by the adoption of our constitution and the admission of the State into the Union. (*Escanaba Co.* v. *Chicago,* 107 U. S. 678; *Huse* v. *Glover,* 119 id. 543.) The ordinance did not, however, by any means as originally adopted, impose upon the States the duty of religious instruction in the schools which were to

be encouraged. It recognized education as a means promotive of religion and morality by the increase of knowledge. The recital or preamble recognized religion, morality and knowledge as three things essential to good government and the happiness of the people, and to secure those three things it enacted, not that religious instruction (which is not within the province of civil government) should be given by the States, but that the means of education should be encouraged and thus the essentials of good government should be promoted.

The question for decision is one of constitutional power. The Bible is not mentioned in our State constitution. It was mentioned in the convention which framed the constitution when it was sought to add to section 3 of article 8 a provision prohibiting the exclusion of the Bible from the public schools, but the amendment proposed was not adopted. What is the Bible? Different sects of Christians disagree in their answers to this question. They agree that the Bible is the inspired word of God, that the Creator of the Universe is its author, and that it is a book of divine instruction as to the creation of man, his relation to, dependence on and accountability to God. The historical and literary features of the Bible are of the greatest value, but its distinctive feature is its claim to teach a system of religion revealed by direct inspiration from God. It bases its demand for the reverence and allegiance of mankind upon the direct authority of God himself. The various Protestant sects of Christians use the King James version, published in London in 1611, while Catholics use the Douay version, of which the Old Testament was published by the English college at Douay, in France, in 1609, and the New Testament by the English college at Rheims in 1582, and these two versions are often called, respectively, the Protestant Bible and the Catholic Bible. The original manuscripts containing the inspired word of God, written in Hebrew, in Aramaic and in Greek, have all been lost for

many hundreds of years, and each of the Bibles mentioned is a translation, not of those manuscripts, but of translations thereof into the Greek and Latin. (Roman Catholic and Protestant Bibles Compared, Gould Prize Essays; Gigot's General Introduction to Study of Scriptures.) The earliest copy of the Old Testament in Hebrew now in existence was made as late as the eleventh century, though there are partial copies made in the ninth and tenth centuries. The oldest known Greek manuscripts of the Bible, except a few fragments, belong to the fourth and fifth centuries. Each party claims for its own version the most accurate presentation of the inspired word as delivered to mankind and contained in the original Scriptures. The versions differ in many particulars. There are differences of translation, many of which seem unimportant, though Catholics claim that there are cases of willful perversion of the Scriptures in King James' translation, from which erroneous doctrines and inferences have been drawn. The Lord's Prayer is differently translated in the two versions. Of the different translations of the Lord's Prayer in later versions of the Bible the following language of a Protestant has been quoted with approval by a Catholic author: "Even the Lord's Prayer has been tampered with and a discord thrown into the daily devotions. The inspired text is changed and unsettled, the faith of the people in God's holy word is undermined and aid and comfort given the enemy of all religion." The Douay version also contains six whole books and portions of other books which are not included in King James' version. The Catholic church regards these as a part of the inspired Scriptures, entitled to the same faith and reverence as the other portions of the Bible, while the Protestant churches do not recognize them as a part of the Scriptures.

Christianity is a religion. The Catholic church and the various Protestant churches are sects of that religion. These two versions of the Scriptures are the bases of the

religion of the respective sects.   Protestants will not accept
the Douay Bible as representing the inspired word of God.
As to them it is a sectarian book containing errors, and
matter which is not entitled to their respect as a part of the
Scriptures.   It is consistent with the Catholic faith but not
the Protestant.   Conversely, Catholics will not accept King
James' version.   As to them it is a sectarian book incon-
sistent in many particulars with their faith, teaching what
they do not believe.   The differences may seem to many
so slight as to be immaterial, yet Protestants are not found
to be more willing to have the Douay Bible read as a regu-
lar exercise in the schools to which they are required to
send their children, than are Catholics to have the King
James version read in schools which their children must at-
tend.   Differences of religious doctrine may seem imma-
terial to some while to others they seem vitally important.
Sectarian aversions, bitter animosities and religious perse-
cutions have had their origin in apparently slender distinc-
tions.   The schism between the Presbyterian Church of the
United States of America and the Cumberland Presbyterian
Church in 1810 grew out of a difference of opinion as to
the teachings of the Westminster confession of faith con-
cerning the doctrines of universal fore-ordination, election
and reprobation.   The differences in doctrine existing in
their revised confessions of faith in 1906 seemed so slight
to the respective general assemblies of those churches as
to form no obstacle to the reunion of the two as a single
church, yet to thousands of the members of the Cumber-
land Presbyterian Church the differences seem now so vital
that their consciences will not permit of their consenting to
the union, and they have adhered to their own organization
even where they have been obliged to surrender the church
property.   That religious controversy we declined to deter-
mine because it was a religious controversy and not within
our cognizance as a part of the civil government.   (*Pres-
byterian Church* v. *Cumberland Presbyterian Church,* 245

Ill. 74.) The importance of men's religious opinions and differences is for their own, and not for a court's, determination. With such differences, whether important or unimportant, courts or governments have no right to interfere. It is not a question to be determined by a court in a country of religious freedom what religion or what sect is right. That is not a judicial question. All stand equal before the law,—the Protestant, the Catholic, the Mohammedan, the Jew, the Mormon, the free-thinker, the atheist. Whatever may be the view of the majority of the people, the court has no right, and the majority has no right, to force that view upon the minority, however small. It is precisely for the protection of the minority that constitutional limitations exist. Majorities need no such protection,—they can take care of themselves.

The reading of the Bible in school is instruction. Religious instruction is the object of such reading, but whether it is so or not, religious instruction is accomplished by it. The Bible has its place in the school, if it is read there at all, as the living word of God, entitled to honor and reverence. Its words are entitled to be received as authoritative and final. The reading or hearing of such words can not fail to impress deeply the pupils' minds. It is intended and ought to so impress them. They cannot hear the Scriptures read without being instructed as to the divinity of Jesus Christ, the Trinity, the resurrection, baptism, predestination, a future state of punishments and rewards, the authority of the priesthood, the obligation and effect of the sacraments, and many other doctrines about which the various sects do not agree. Granting that instruction on these subjects is desirable, yet the sects do not agree on what instruction shall be given. Any instruction on any one of the subjects is necessarily sectarian, because, while it may be consistent with the doctrines of one or many of the sects, it will be inconsistent with the doctrine of one or more of them. The petitioners are Catholics. They are compelled

by law to contribute to the maintenance of this school and are compelled to send their children to it, or, besides contributing to its maintenance, to pay the additional expense of sending their children to another school.   What right have the teachers of the school to teach those children religious doctrine different from that which they are taught by their parents?   Why should the State compel them to unlearn the Lord's Prayer as taught in their homes and by their church and use the Lord's Prayer as taught by another sect?   If Catholic children may be compelled to read the King James version of the Bible in schools taught by Protestant teachers, the same law will authorize Catholic teachers to compel Protestant children to read the Catholic version.   The same law which subjects Catholic children to Protestant domination in school districts which are controlled by Protestant influences will subject the children of Protestants to Catholic control where the Catholics predominate.   In one part of the State the King James version of the Bible may be read in the public schools, in another the Douay Bible, while in school districts where the sects are somewhat evenly divided, a religious contest may be expected at each election of a school director to determine which sect shall prevail in the school.   Our constitution has wisely provided against any such contest by excluding sectarian instruction altogether from the school.

We have been considering the case of the Protestant and the Catholic.   Let us consider that of the Christian and the Jew.   The Christian believes that Judaism was a temporary dispensation, and that Christ was the Messiah,—the Savior of the world.   The Jew denies that Christ was the Messiah and regards him as an impostor.   Is it not the teaching of sectarian doctrine to his children to read to them daily from the New Testament, every chapter of which holds up Christ crucified as the Savior of men?

The Bible, in its entirety, is a sectarian book as to the Jew and every believer in any religion other than the Chris-

tian religion and as to those who are heretical or who hold beliefs that are not regarded as orthodox. Whether it may be called sectarian or not, its use in the schools necessarily results in sectarian instruction. There are many sects of Christians, and their differences grow out of their differing constructions of various parts of the Scriptures,—the different conclusions drawn as to the effect of the same words. The portions of Scripture which form the basis of these sectarian differences cannot be thoughtfully and intelligently read without impressing the reader, favorably or otherwise, with reference to the doctrines supposed to be derived from them. The petition avers that selected portions of the Bible have been read by the teachers, without averring what portions, so that it does not appear whether or not the portions so read involved any doctrinal or sectarian question. No test suggests itself to us, and perhaps it would be impossible to lay down one, whereby to determine whether any particular part of the Bible forms the basis of or supports a sectarian doctrine. Such a test seems impracticable. The only means of preventing sectarian instruction in the schools is to exclude altogether religious instruction, by means of the reading of the Bible or otherwise. The Bible is not read in the public schools as mere literature or mere history. It cannot be separated from its character as an inspired book of religion. It is not adapted for use as a text book for the teaching, alone, of reading, of history or of literature, without regard to its religious character. Such use would be inconsistent with its true character and the reverence in which the Scriptures are held and should be held. If any parts are to be selected for use as being free from sectarian differences of opinion, who will select them? Is it to be left to the teacher? The teacher may be religious or irreligious, Protestant, Catholic or Jew. To leave the selection to the teacher, with no test whereby to determine the selection, is to allow any part selected to be read, and is substantially equivalent to permitting all to be read.

It is true that this is a Christian State. The great majority of its people adhere to the Christian religion. No doubt this is a Protestant State. The majority of its people adhere to one or another of the Protestant denominations. But the law knows no distinction between the Christian and the Pagan, the Protestant and the Catholic. All are citizens. Their civil rights are precisely equal. The law cannot see religious differences, because the constitution has definitely and completely excluded religion from the law's contemplation in considering men's rights. There can be no distinction based on religion. The State is not, and under our constitution cannot be, a teacher of religion. All sects, religious or even anti-religious, stand on an equal footing. They have the same rights of citizenship, without discrimination. The public school is supported by the taxes which each citizen, regardless of his religion or his lack of it, is compelled to pay. The school, like the government, is simply a civil institution. It is secular, and not religious, in its purposes. The truths of the Bible are the truths of religion, which do not come within the province of the public school. No one denies their importance. No one denies that they should be taught to the youth of the State. The constitution and the law do not interfere with such teaching, but they do banish theological polemics from the schools and the school districts. This is done, not from any hostility to religion, but because it is no part of the duty of the State to teach religion,—to take the money of all and apply it to teaching the children of all the religion of a part, only. Instruction in religion must be voluntary. Abundant means are at hand for all who seek such instruction for themselves or their children. Organizations whose purpose is the spreading of religious knowledge and instruction exist, and many individuals, in connection with such organizations and independently, are devoted to that work. Religion is taught, and should be taught, in the churches, Sunday schools, parochial and other church

schools and religious meetings. Parents should teach it to their children at home, where its truths can be most effectively enforced. Religion does not need an alliance with the State to encourage its growth. The law does not attempt to enforce christianity. Christianity had its beginning and grew under oppression. Where it has depended upon the sword of civil authority for its enforcement it has been weakest. Its weapons are moral and spiritual and its power is not dependent upon the force of a majority. It asks from the civil government only impartial protection and concedes to every other sect and religion the same impartial civil right. "United with government, religion never rises above the merest superstition; united with religion, government never rises above the merest despotism; and all history shows us that the more widely and completely they are separated the better it is for both." *Board of Education of Cincinnati* v. *Minor,* 23 Ohio St. 211.

In several of the States the provisions of their respective constitutions have been considered with respect to their effect upon the right of school officers to cause the Bible to be read in the public schools. In Maine, Massachusetts, Michigan, Iowa, Kansas, Kentucky and Texas it has been held that such reading of the Bible, or exercises such as those described in the petition in this case, are not in violation of any of the provisions of the constitutions of those States. (*Donahoe* v. *Richards,* 38 Me. 379; *Spiller* v. *Inhabitants of Woburn,* 12 Allen, 127; *Pfeiffer* v. *Board of Education of Detroit,* 118 Mich. 560; *Billard* v. *Board of Education,* 69 Kan. 53; *Moore* v. *Monroe,* 64 Iowa, 367; *Church* v. *Bullock,* 109 S. W. Rep. 115; 16 L. R. A. [N. S.] 860; *Hackett* v. *Brooksville School District,* 120 Ky. 608.) In Wisconsin and Nebraska the decisions were adverse to the use of the Bible in the schools. (*State* v. *District Board,* 76 Wis. 177; *State* v. *Scheve,* 65 Neb. 853.) In *O'Connor* v. *Headrick,* 184 N. Y. 421, it was held that a regulation which prohibited teachers in the public

schools from wearing a distinctively sectarian garb while engaged in teaching was legal and reasonable. The costume in question in that case was the distinctive dress worn by the Roman Catholic religious order known as the Sisterhood of St. Joseph. The respect inspired in the pupils for the religious denomination of their teachers thus manifested was regarded as a sectarian influence. On the other hand, the Supreme Court of Pennsylvania has held that sisters of a religious order of the Roman Catholic church might be employed as teachers in the public schools, and permitted, while teaching, to wear the garb of their order. (*Hysong v. Gallitzin School District,* 164 Pa. 629.) The constitutions of Maine, Massachusetts and Michigan do not contain the prohibitions of our constitution, and differ so widely from the latter that the decisions in those States have little bearing on the question here presented. The Kentucky and Kansas decisions seem to consider the fact that the children of the complainants were not compelled to join in the exercises as affecting the question in some way. That suggestion seems to us to concede the position of the plaintiffs in error. The exclusion of a pupil from this part of the school exercises in which the rest of the school joins, separates him from his fellows, puts him in a class by himself, deprives him of his equality with the other pupils, subjects him to a religious stigma and places him at a disadvantage in the school, which the law never contemplated. All this is because of his religious belief. If the instruction or exercise is such that certain of the pupils must be excused from it because it is hostile to their or their parents' religious belief, then such instruction or exercise is sectarian and forbidden by the constitution. While some of these decisions tend to sustain the proposition that the reading of the Bible, prayer and singing of hymns in accordance with the usual method of conducting devotional exercises in Protestant denominations may be required of the pupils of a public school against the protest and reli-

gious convictions of the pupils and their parents, we cannot assent to the reasoning on which such decisions are founded and apply it to the provisions of our constitution.

This question has never been passed upon by this court. In *Millard* v. *Board of Education,* 121 Ill. 297, it appeared that the Angelus prayer, used in Roman Catholic churches, was said by teachers and pupils when school closed at noon. It did not appear to be required of or by anybody, but, so far as appeared, it was by a voluntary understanding between the teachers and scholars, to which no scholar or parent objected, and it did not appear that the complainant had any children attending the school. It was held that no rights of the complainant were shown to be violated. In *North* v. *Trustees of the University of Illinois,* 137 Ill. 296, it was held that a rule of the university requiring students to attend chapel exercises unless excused for good cause was not in violation of the constitution. It has been held that the temporary use of a school house for religious meetings is not forbidden by the constitution. (*Nichols* v. *School Directors,* 93 Ill. 61.) In *McCormick* v. *Burt,* 95 Ill. 263, it was held that school directors, acting in good faith and not maliciously, are not answerable in damages for the expulsion of a pupil for refusing to observe a rule requiring all pupils to lay aside their books and remain quiet during the opening exercises, which consisted in reading a chapter from the King James translation of the Bible. School directors are vested with discretion in determining what rules will best promote the good order and well being of the school, and though they may err as to their powers and duties under the law or as to the facts submitted to them, they are not liable to a suit for damages for their mistakes honestly made, but only for malicious acts. These decisions have little or no bearing on the question here.

In our judgment the exercises mentioned in the petition constitute religious worship and the reading of the Bible in the school constitutes sectarian instruction. The de-

murrer to the amended petition should therefore, in our opinion, have been overruled.

The judgment is reversed and the cause remanded to the circuit court, with directions to overrule the demurrer.

*Reversed and remanded, with directions.*

HAND and CARTWRIGHT, JJ., dissenting:

This was a petition filed in the name of the People, upon the relation of Jeremiah Ring, John J. Doyle, Johanna Watt, Mary Murphy and Bridget Markillie, against the Board of Education of School District No. 24, township 14, range 12, in Scott county, for a peremptory writ of *mandamus* to require the said board of education to cause the teachers in the public schools of said school district, during school hours, to discontinue the practice of reading passages from the King James version of the Bible; from causing the pupils of said schools to recite in concert the Lord's Prayer as it is found in the King James version of the Bible, and from singing sacred hymns. The board of education filed a demurrer to said petition, which was sustained and the petition was dismissed, and a writ of error has been sued out from this court to review the judgment of the circuit court, and this court is asked to hold that the constitutions of the United States and this State prohibit the reading of the King James version of the Bible, the repeating of the Lord's Prayer in concert as it is found in that version of the Bible, and the singing of sacred hymns by the teachers and pupils of our public schools during school hours, and the majority opinion holds that such acts are prohibited by constitutional enactment.

The sections of the State and Federal constitutions which it is claimed are violated read as follows:

"The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever be guaranteed; and no person shall be denied any civil or political right, privilege or capacity, on account of his religious

245—23

opinions; but the liberty of conscience hereby secured shall not be construed to dispense with oaths or affirmations, excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of the State. No person shall be required to attend or support any ministry or place of worship against his consent, nor shall any preference be given by law to any religious denomination or mode of worship." (Const. of 1870, art. 2, sec. 3.)

"Neither the General Assembly nor any county, city, town, township, school district, or other public corporation, shall ever make any appropriation or pay from any public fund whatever, anything in aid of any church or sectarian purpose, or to help support or sustain any school, academy, seminary, college, university, or other literary or scientific institution, controlled by any church or sectarian denomination whatever; nor shall any grant or donation of land, money, or other personal property ever be made by the State or any such public corporation, to any church, or for any sectarian purpose." (Const. of 1870, art. 8, sec. 3.)

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." (1st amendment to const. of U. S.)

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." (14th amendment to const. of U. S. sec. 1.)

The Federal constitution does not control in the matter of public schools or in what instructions shall be given

therein, but the regulation of public schools, as well as their support, rests with and devolves upon the several States. Nor does the constitution of the United States provide for protecting the citizens of the respective States in their religious liberties. This is left to the State constitutions and laws. Nor is there any inhibition imposed by the constitution of the United States in this respect on the States. (*Permoli* v. *Municipality No. 1 of New Orleans,* 3 How. 589; 11th L. ed. 739.) The question, therefore, to be decided in this case is, is the reading of the Bible in the public schools of this State prohibited by our State constitution?

The Bible is not mentioned in the constitution, nor is there found therein any express inhibition against the giving of religious or moral instruction in the public schools, and while the constitution is silent upon those subjects, it has been from the formation of our State government to the present time universally recognized by the people that there are certain fundamental principles of religion and morality which the safety of society requires should be imparted to the youth of the State, and that those principles may be properly taught in the public schools as a part of the secular knowledge which it is their province to instil into the youthful mind. That this may be done without the infraction of any of the safeguards of the constitution is recognized in all the cases where the right to read the Bible in the public schools has been conceded, so far as we have been able to discover. Even as early as the ordinance of 1787 the men who framed that great charter of liberty sought to secure to the inhabitants of the Northwest Territory, and their posterity, the inestimable blessings of religious and moral instruction. It is therein provided that "religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." And Mr. Justice Lyon, in *State* v. *District School Board,* 76 Wis. 177, which is the main authority relied upon by the relators,

while considering this phase of the question and while referring to the Bible, said (p. 195) : "Furthermore, there is much in the Bible which cannot justly be characterized as sectarian. There can be no valid objection to the use of such matter in the secular instruction of the pupils. Much of it has great historical and literary value, which may be thus utilized without violating the constitutional prohibition. It may also be used to inculcate good morals,—that is, our duties to each other,—which may and ought to be inculcated by the district schools. No more complete code of morals exists than is contained in the New Testament, which re-affirms and emphasizes the moral obligations laid down in the Ten Commandments. Concerning the fundamental principles of moral ethics the religious sects do not disagree."

It has always been understood that those general provisions found in the several State constitutions which usually appear in what are designated as a "bill of rights," and which provide that the enjoyment of the free exercise of religious profession and worship, without discrimination, shall be forever guaranteed to the people, and that they shall not be required to attend upon or support any ministry or place of worship against their consent, were primarily designed to prevent the establishment of a State religion or the compulsion of the citizen to support, by taxation or otherwise, an established ministry or places of established worship, it being the object of such constitutional provisions to work a complete divorcement of the State and the church, and to sever the relation between the State and church which had existed in the mother country prior to the Revolution and secure to the citizen freedom of conscience in the matter of religious belief and worship, and that the instruction which was to be imparted in the public schools did not fall within those provisions of the State constitution unless the instruction sought to be imparted degenerated into what may be properly designated

as denominational or sectarian instruction and falls within the inhibition of those provisions of the constitution which were enacted with a view to placing all religious denominations or religious sects upon an equality before the law. (*Nichols* v. *School Directors,* 93 Ill. 61; *Donahoe* v. *Richards,* 38 Me. 379; 61 Am. Dec. 256.) We think it obvious, therefore, that all must agree that there can be no rational constitutional basis upon which this court can hold that the Bible can be excluded from the public schools of the State other than upon the ground that it is sectarian in character and falls within those inhibitions of the State constitution which prohibit teaching in our public schools the beliefs and doctrines of the different denominations or sects into which the believers of the Bible have in the course of time divided.

In all the cases upon this subject which the diligence of counsel have been able to discover,—and, so far as we can learn, they have found them all,—when the Bible has been excluded from or when it has been admitted to the public schools, the question turned upon (1) whether or not the Bible was viewed by the court then considering the question to be sectarian in its character or non-sectarian in its character; and (2) whether the engaging in the reading of the Bible, repeating the Lord's Prayer, singing songs, etc., rendered the public school in which the exercises were held a place of public worship. None of the courts of last resort have held that the Bible, as an entirety, could be excluded from the public schools on constitutional grounds, as none of them have held that all parts of it were sectarian. The Supreme Courts of two States, Wisconsin and Nebraska, (*State* v. *District School Board, supra; State* v. *Scheve,* 65 Neb. 853;) have held that certain portions of the Bible are sectarian in their character while others are not sectarian in character, and that the sectarian portions should be excluded from the public schools while the non-sectarian portions might be read. Neither of these courts, however,

lays down any test or tests or points out any course of reasoning whereby the school boards, teachers, patrons or pupils of the public schools can certainly determine what portions of the Bible are sectarian and what portions are non-sectarian,—that is, what portions may and what portions may not be read in the public schools; and it would seem essential in a matter of so great importance to the success of the public schools (there should be no doubt if only a part of the Bible is to be admitted and only a part of the Bible is to be excluded from the public schools) that there should be some test or tests or some course of reasoning pointed out by the courts which could be applied by the school boards, teachers, patrons and pupils, so that all might know with reasonable certainty what portions of the Bible might and what portions might not be read in the public schools. To leave the determination of those questions in doubt would be to invite strife and stir up litigation in almost every case where a portion of the Bible had been admitted or excluded from the public school. As to whether the portions admitted or rejected were, within the view of the law, sectarian or non-sectarian, we assume no rule upon this subject was announced by those courts, as, doubtless, by reason of the character of the question involved, no rational rule on the subject could be formulated. If this is true, as it would seem to be, it perhaps would lead to the conclusion that the Bible should be held by the courts to be either sectarian or non-sectarian in character in its entirety, and cause the legal mind to doubt the soundness of the judgments of those courts which hold that the Bible in part may be read in the public schools and in part must be excluded from the public schools. The Supreme Courts of Maine, Massachusetts, Michigan, Iowa, Kentucky, Kansas and Texas (*Donahoe* v. *Richards,* 38 Me. 379; *Spiller* v. *Inhabitants of Woburn,* 12 Allen, 127; *Pfeiffer* v. *Board of Education of Detroit,* 118 Mich. 560; *Moore* v. *Monroe,* 64 Iowa, 367; *Hackett* v. *Brooksville*

*School District,* 120 Ky. 608; *Billard* v. *Board of Education,* 69 Kan. 53; *Church* v. *Bullock,* (Tex.) 16 L. R. A. [N.S.] 860;) have each held the Bible to be non-sectarian in character in its entirety and that no part of it could be excluded from the public schools on constitutional grounds. The judgments of those courts would seem at least to be capable of enforcement and to announce a definite rule and one that would be readily understood by the school boards, teachers, patrons and pupils, and the reasons given in support of those judgments appear to be satisfactory, convincing and logical. The Supreme Court of every State of the Union which has spoken on the subject, with the exception of Wisconsin and Nebraska, has held that the reading of the Bible in the public schools is not prohibited by constitutional enactment, and the Supreme Courts of Wisconsin and Nebraska each hold that only portions of the Bible may be excluded. The majority opinion does not cite a single case, and one cannot be found, which sustains the position assumed therein, but that opinion is in conflict with the adjudications of the Supreme Court of the United States and the Supreme Courts of Maine, Massachusetts, Ohio, Michigan, Iowa, Kentucky, Kansas, Texas, Wisconsin and Nebraska upon the questions here involved, and this conflict cannot be explained upon a difference of constitutional enactment, as no essential difference has been, and cannot be, pointed out upon this subject between the constitution of this State and the constitutions of the States referred to. The majority opinion is also out of harmony with all our previous decisions on the subject and either ignores these decisions or misinterprets them.

We think it apparent that it must be held, from a constitutional standpoint, that all parts of the Bible can be read in the public schools or that it must be excluded as an entirety from the public schools, and the Supreme Court of Ohio (*Board of Education of Cincinnati* v. *Minor,* 23 Ohio St. 211,) has held that the Bible could not be admitted

to the public schools of the State against the wish of the school board in control of the schools in the city where the question arose, but that its admission or exclusion from the public schools of that State rested entirely with the several school boards in charge of the schools of the State.

It is stated in a note to *County of Cook* v. *Industrial School,* 125 Ill. 540, (where the same is reported in 8 Am. St. Rep. 386,) that the constitutions of twenty-three States, in addition to that of Illinois, contain provisions prohibiting the payment of moneys or any appropriation or grant for the support, benefit or in aid of sectarian schools. In the twenty-three States designated, the wording of their constitutions differs somewhat on this question, and none of them, we think, correspond in exact terms with the constitutional provisions on the subject as they are found in the constitution of this State. We believe them, however, in principle, to all substantially agree. We think, therefore, the question here to be determined does not differ from the question determined by the several Supreme Courts of our sister States that have spoken upon this question, and that the subject, for the purposes of this case, may be condensed into the following propositions: First, was the reading of the Bible by the teachers, the repeating of the Lord's Prayer in concert and the singing of sacred hymns by the pupils in said schools sectarian religious instruction? Second, did the conducting of the foregoing exercises in said public schools in the manner in which the bill avers them to have been conducted make said schools places of worship, which the relators' children were required to attend and the relators who were tax-payers required to support? These propositions will be considered in their order.

There is no book that is so widely read or so highly respected as the Bible or that has had so great an influence upon the habits and lives of mankind, and all men whose judgments are of value,—even those who deny its divine origin,—admit it to be a great historical and literary store-

house and that its teachings are of the greatest value to the world. While numerous translations have been made of the Bible and many editions of it published since the art of printing and manufacture of paper were discovered, the version of King James I, (1607-1611,) which is the version generally used by the Protestants, and the one compiled at Douay some time previous and which was later adopted by the Roman Catholic church as the only authentic version, are the versions generally in use in this country. We do not think the Bible can be said to be a sectarian book or that its teachings are sectarian. Its plan of salvation is broad enough to include all the world, and the fact that those who believe in the Bible do not agree as to the interpretation of its teachings and have divided into sects, and are therefore sectarian in their beliefs, does not change the Bible or make it a sectarian book. To make the Bible sectarian it must be made to appear that it teaches the dogmas of some particular sect, and it is not sufficient, to show that it is sectarian, to establish that its teachings are so comprehensive that different phases of belief may be founded on arguments based upon some of its parts which, when perhaps only imperfectly examined and partially understood, may seem to tend to support the doctrines of a particular sect and to overthrow the doctrines of some other sect. Much has been written upon the subject as to whether the Bible is sectarian and whether or not there is a difference between sectarianism and christianity as taught by the Bible. We will call attention to some of the cases where the question now under consideration has been considered by other courts and will quote from them quite extensively, even at the risk of some repetition.

In *Vidal* v. *Girard's Exrs.* 2 How. 127, (11 L. ed. 205,) the question was whether a charitable bequest made by Stephen Girard to establish a college in the city of Philadelphia was void because it prohibited the teaching of the christian religion within the college. The will provided

that no ecclesiastic, missionary or minister of any sect whatever should ever hold or exercise any station or duty within the college, and that no such person should ever be admitted, as a visitor or otherwise, within the premises appropriated for the purposes of the college. The court, in sustaining the trust, said (p. 197) : "This objection is, that the foundation of the college upon the principles and exclusions prescribed by the testator is derogatory and hostile to the Christian religion, and so is void as being against the common law and public policy of Pennsylvania. * * * The objection itself assumes the proposition that christianity is not to be taught because ecclesiastics are not to be instructors or officers. But this is by no means a necessary or legitimate inference from the premises. Why may not a layman instruct in the general principles of christianity as well as ecclesiastics? There is no restriction as to the religious opinions of the instructors and officers. They may be, and doubtless under the auspices of the city government they will always be, men not only distinguished for learning and talents but for piety and elevated virtue and holy lives and characters, and we cannot overlook the blessings which such men, by their conduct as well as their instructions, may,—nay, must,—impart to their youthful pupils. Why may not the Bible, and especially the New Testament, without note or comment, be read and taught as a divine revelation in the college, its general precepts expounded, its evidences explained and its glorious principles of morality inculcated? What is there to prevent a work, not sectarian, upon the general evidences of christianity, from being read and taught in the college by lay teachers? Certainly there is nothing in the will that proscribes such studies. Above all, the testator positively enjoins 'that all the instructors and teachers in the college shall take pains to instil into the minds of the scholars the purest principles of morality, so that on their entrance into active life they may, from in-

clination and habit, evince benevolence towards their fellow-creatures and a love of truth, sobriety and industry, adopting at the same time such religious tenets as their matured reason may enable them to prefer.' Now, it may well be asked, what is there in all this which is positively enjoined, inconsistent with the spirit or truths of christianity? Are not these truths all taught by christianity, although it teaches much more? Where can the purest principles of morality be learned so clearly or so perfectly as from the New Testament? Where are benevolence, the love of truth, sobriety and industry so powerfully and irresistibly inculcated as in the sacred volume? The testator has not said how these great principles are to be taught or by whom, except it be by laymen, nor what books are to be used to explain or enforce them. All that we can gather from his language is that he desired to exclude sectarians and sectarianism from the college, leaving the instructors and officers free to teach the purest morality, the love of truth, sobriety and industry, by all appropriate means, and, of course, including the best, the surest and the most impressive." In reviewing this case in *Hackett* v. *Brooksville School District, supra,* Mr. Justice O'Rear concludes: "Two points are emphasized by the reasoning of the learned judge: (1) That it was sectarianism that was prohibited; and (2) that the Bible is not a sectarian book,—which are the two points most prominent in this case."

The case of *Donahoe* v. *Richards, supra,* is an early case, and was an action against a school board for expelling a pupil who refused to read the King James version of the Bible in the public school, that book having been adopted by the school board as one to be used by the pupils in their school work. The court said: "The common schools are not for the purpose of instruction in the theological doctrines of any religion or of any sect. The State regards no one sect as superior to any other, * * * and if the peculiar tenets of any particular sect were so taught, it would

furnish a well-grounded cause of complaint on the part of those who entertained different or opposing religious sentiments." The court further said: "The Bible was used merely as a book in which instruction in reading was given. But reading the Bible is no more an interference with religious belief than would reading the mythology of Greece or Rome be regarded as interfering with religious belief or an affirmance of the pagan creeds."

In *Spiller* v. *Inhabitants of Woburn, supra,* it was held that the public school committee did not exceed their authority in passing an order that the Bible should be read at the opening of the schools on the morning of each day. "No more appropriate method could be adopted," said the court, "of keeping in the minds of both teachers and scholars that one of the chief objects of education, as declared by the statutes of this commonwealth, and which teachers are especially enjoined to carry into effect, is 'to impress on the minds of children and youth committed to their care and instruction the principles of piety and justice and a sacred regard for the truth.' "

In *Pfeiffer* v. *Board of Education of Detroit, supra,* it was held the use in the public schools, for fifteen minutes at the close of each day's session, as a supplemental text book on reading, of a book entitled "Readings from the Bible," which is largely made up of extracts from the Bible, emphasizing the moral precepts of the Ten Commandments, where the teacher is forbidden to make any comment upon the matter therein contained and is required to excuse from that part of the session any pupil upon application of his parent or guardian, is not a violation of the State constitution (art. 4, sec. 41,) prohibiting the legislature from diminishing or enlarging "the civil or political rights, privileges and capacities of any person on account of his opinion or belief concerning matters of religion."

In *Hackett* v. *Brooksville School District, supra,* a taxpayer sought an injunction to restrain the teachers and

trustees from reading from the King James version of the Bible in the schools and from opening the school with prayers and songs alleged to be of a denominational character. The case went to the court of appeals, where, in a most learned and exhaustive opinion, it was held the injunction was properly denied.   The court, on page 593, said: "The main question we conceive to be, is the King James translation of the Bible,—or, for that matter, any edition of the Bible,—a sectarian book?   There is, perhaps, no book that is so widely used and so highly respected as the Bible; no other that has been translated into as many tongues; no other that has had such marked influence upon the habits and life of the world.   It is not the least of its marvelous attributes that it is so catholic that every seeming phase of belief finds comfort in its comprehensive precepts.   Many translations of it, and of parts of it, have been made from time to time.   *   *   *   There is controversy over the authenticity of some parts of some of the editions, and there are some people who do not believe that any of it is the inspired or revealed word of God; yet it remains that civilized mankind generally accord to it a reverential regard, while all who study its sublime sentiments and consider its great moral influence must admit that it is, from any point of view, one of the most important of books.   *   *   *   That the Bible, or any particular edition, has been adopted by one or more denominations as authentic or by them asserted to be inspired cannot make it a sectarian book.   The book itself, to be sectarian, must show that it teaches the peculiar dogmas of a sect as such, and not alone that it is so comprehensive as to include them by the partial interpretation of its adherents.   Nor is a book sectarian merely because it was edited or compiled by those of a particular sect.   It is not the authorship nor mechanical composition of the book, nor the use of it, but its contents, that give it its character.   *   *   *   If the legislature or the constitutional convention had intended that the Bible should be pro-

scribed they would simply have said so. The word 'Bible' is shorter and better understood than the word 'sectarian.' It is not conceivable that if it had been intended to exclude the Bible from public schools that purpose would have been obscured within the controversial word. Nor can we conceive that under the American system of providing thorough education of all the youth, to fit them for good citizenship in every sense, the legislature or the constitutional convention could have intended to exclude from their course of instruction any consideration of such a work, whose historical and literary value, aside from its theological aspects, would seem to entitle it to a high place in any well-ordered course of general instruction. The history of a religion, including its teachings and claim of authority,—as, for example, the writings of Confucius or Mahomet,—might be profitably studied; why may not also the wisdom of Solomon and the life of Christ? If the same things were in any other book than the Bible, it would not be doubted that it was within the discretion of the school boards and teachers whether it was expedient to include them in the common school course of study without violating the impartiality of the law concerning religious beliefs."

In the case of *State v. Scheve, supra,* each of the several judges of the Supreme Court of Nebraska filed an opinion, and upon a petition for a rehearing an additional opinion was filed. Mr. Justice Holcomb, in the opinion filed by him, said: "The Bible itself is not a sectarian book and it is an erroneous conception to so regard it. Altogether, aside from its theological aspects, the Bible has a historical and literary value surpassed by no secular writings. Its moral teachings and precepts are of the purest and highest, and appeal to the noblest impulses of mankind as no other literary production ever has. Can anyone successfully contend, in the light of the contemporaneous history of the times, that the constitutional framers and the people who adopted that instrument intended to altogether ex-

clude the Bible from the schools? If such had been the
intention, would not the members of the convention have
expressed themselves in such language as could not be mis-
understood? * * * The provisions of the constitution
on the subject of sectarian instruction in the public schools
should be construed so as to give to them the scope and
effect intended by its framers and the people who adopted
it. This is accomplished by firmly excluding therefrom all
forms of instruction calculated to establish and confirm in
the minds of students those theological doctrines and be-
liefs which are peculiar to some, only, of the different re-
ligious sects. Further than this we are not warranted in
going."

The precise questions here involved do not appear to
have been directly passed upon by this court. There are
a number of cases, however, which have been decided by
this court which bear upon the questions and which lead
to the conclusion that the Bible may be read in the public
schools of this State, and that the reciting of the Lord's
Prayer and the singing of sacred hymns by the pupils do
not constitute acts of worship or make the school a place
of public worship in a constitutional sense. (*Nichols* v.
*School Directors, supra; McCormick* v. *Burt,* 95 Ill. 263;
*Millard* v. *Board of Education,* 121 id. 297; *County of
Cook* v. *Industrial School, supra; North* v. *Trustees of the·
University of Illinois,* 137 Ill. 296.) In the year 1879, in
*Nichols* v. *School Directors, supra,* the question was raised
as to the constitutionality of a statute which provided that
the board of school directors might permit religious meet-
ings and Sunday schools to be held in school houses, and
this court, speaking by Mr. Justice Sheldon, held there was
nothing in the State constitution which prohibited a school
house, with the consent of the school directors, from being
used for the purpose designated by the statutes. He said,
in considering the questions involved in that case, that re-
ligion and religious worship had not been so far placed

under the ban of the constitution that they might not be allowed to become the recipients of any incidental benefit because it flowed from public bodies or the authorities of the State. The soundness of the doctrine announced in that case has never been questioned until now. In the year 1880, in *McCormick* v. *Burt, supra,* this court, speaking through Mr. Justice Scott, held that a school teacher and a board of education were not liable for damages for excluding a pupil from the public schools of this State who refused to comply with the rule which provided that the teacher should read a chapter from the King James version of the Bible as an opening exercise each morning, and that the pupils, during such reading, should lay aside their books and remain quiet. The court, in the course of its opinion, said, "The rule is certainly a reasonable one." In 1887, in *Millard* v. *Board of Education, supra,* the court held, speaking through Mr. Justice Craig, that there was nothing in the constitution of this State to prevent a board of education from permitting, as an opening exercise of the school, the recital by the pupils of the Angelus prayer. And in *North* v. *Trustees of the University of Illinois, supra,* which was decided in 1891, this court, speaking through Mr. Justice Wilkin, held that a rule of the State university requiring all students who had not been excused to attend chapel exercises, where the New Testament was read, the Lord's Prayer recited, religious hymns sung and religious addresses delivered, was not unreasonable, and that the rule, or its enforcement, was not prohibited by the constitution of this State; and it may be remarked of this case that the soundness of the doctrine announced has never been questioned until now. At the time all these cases were before the court and under consideration, and when decided, Mr. Justice Scholfield and Mr. Justice Craig were members of this court, both of whom were members of the constitutional convention which framed the constitution of 1870, and it must be conceded they were both able and pains-

taking judges; and it is very strange, indeed, if the State constitution which they assisted in framing contained provisions which excluded the Bible from the public schools of this State on the ground it was a sectarian book and prohibited the reciting of the Lord's Prayer and singing the religious hymns in the public schools because they were religious exercises and made the school house a place of public worship, that they did not discover that fact, but that the discovery that the reading of the Bible, the reciting of the Lord's Prayer and the singing of religious hymns in the public schools were unconstitutional was left to a later generation of judges. In *City of Chicago* v. *Reeves,* 220 Ill. 274, in considering the validity of the amendment of the constitution adopted in 1904, on page 296, it was said: "Judges Craig and Scholfield were both members of the constitutional convention of 1870 and were members of this court at the time the amendment of 1878 was proposed and adopted, and Judge Craig wrote the opinion in the *Moore case* and Judge Scholfield that in the *Wilson case,* construing and interpreting that amendment, and it can hardly be presumed that either of these painstaking and able men was not familiar with section 2 of article 14 of the constitution, and its legal effect, at the time of the proposal and adoption of said amendment and at the time they prepared opinions in those cases."

We think the great weight of authority sustains the position that the Bible, or any version thereof, may be read in the public schools of this State, without comment, without violating those inhibitions of the constitution which prohibit the giving of sectarian religious instruction in the public schools. The opinion of the Supreme Court of Wisconsin which holds only portions of the Bible may be read in the public schools was repudiated by this court in *North* v. *Trustees of the University of Illinois, supra.*

We will next consider the question whether said school, by reason of the exercises hereinbefore referred to being

conducted therein, converted the school into a place of worship which the relators' children were required to attend, and the relators who were tax-payers were required to support. This question has been passed upon adversely to the contention of the relators in the cases above cited from the Supreme Courts of the States of Kentucky and Tennessee, and in *Moore* v. *Monroe, supra,* and in *Nichols* v. *School Directors, supra.* In the Kentucky and Texas cases, by way of illustration, the practice of opening the sessions of legislative assemblies by prayer was referred to, and it was said similar exercises in schools no more made it a place of worship, within the meaning of the constitution, than it made legislative halls places of worship. In the *Nichols case* it was sought to enjoin the directors from allowing the school house to be used by any society or organization for the purpose of holding therein religious meetings. The bill alleged that the directors had given permission to different church organizations to hold religious services in the school house, and that under this permission some of the church organizations intended holding stated meetings therein. The bill alleged that the complainant was a tax-payer in the school district; that he objected to the action of the directors, and that by such action of the school directors he was compelled to aid in furnishing a house of worship, contrary to the law of the land. The circuit court sustained a demurrer to the bill, and this court affirmed its decision, holding that such use of the school house as was proposed was not in violation of section 3 of article 2 of the constitution, or of any other provision of the constitution.

It is urged, however, that the children of relators were required to bow their heads and assume a devotional attitude during the reading of the Bible and the recitation of the Lord's Prayer and the singing of sacred hymns. This is true in part; but the petition does not allege the relators' children were required to participate in the recitation of the Lord's Prayer or in the singing of said sacred hymns. At

most, according to the averments of the petition, the children of relators were required to remain quiet during the exercises, and the fact that they were required to bow their heads and fold their hands during the exercises did not convert the school into a place of worship.   In· *Spiller* v. *Inhabitants of Woburn, supra,* during the exercises the pupils were required to bow their heads.   The court said the regulation "did not prescribe an act which was necessarily one of devotion or religious ceremony.   It went no further than to require the observance of quiet and decorum during the religious service with which the school was opened.   It did not compel a pupil to join in the prayer, but only to assume an attitude which was calculated to prevent interruption by avoiding all communication with others during the service."

It is also said that some of the children in the school were asked to explain certain passages of the Bible which were read.   It does not appear from the petition what the passages were which were required to be explained, what the explanation was, or that the children of relators were ever called upon by the teacher to make such explanation.   We think, therefore, that the fact that some of the children in the school were required to explain the meaning of certain passages of scripture which were read in their presence did not convert the school into a place of worship.

Our conclusion is that the exercises which were conducted in said school did not convert the school into a place of worship which the relators' children were required to attend or the relators who were tax-payers were required to support.

The questions involved in the last proposition are not as vital to a decision of this case as the main question involved in the first proposition, viz., is the reading of the Bible, or any translation thereof, in the public schools of this State, without comment, sectarian religious instruction?—which question is the principal one discussed in the briefs and was

undoubtedly considered by the parties as the pivotal question in the case, and the other questions were only thrown in as makeweights. In holding that the Bible, or any of its translations, may be read in the public schools of the State without comment, and that when so read the reading thereof is not sectarian religious instruction and does not convert the school where it is read into a place of worship, it must not be thought that we would have this court assume the power to determine whether the Bible, or any translation thereof, shall or shall not be read in the public schools of the State. That power is vested in other hands. Nor must it be thought that we would have this court assume to determine which one of the several translations referred to is the correct translation of the Bible or that all of said translations are not correct, or to determine which translation, if any, shall be read in the public schools, or which one of the many sects or denominations into which the believers of the Bible have divided, teaches, as a part of its creed or church doctrine, the correct interpretation of the Bible. With those questions, or any of them, this court is not, in the decision of this case, concerned. All we would have the court decide is that the constitution of this State does not prohibit the reading of the Bible, or any of its translations, in the public schools, and that the exercises as carried on in the schools in question did not make them a place of worship.

Section 1 of article 8 of the constitution of 1870 provides: "The General Assembly shall provide a thorough and efficient system of free schools, whereby all children of this State may receive a good common school education." In pursuance of this constitutional provision, legislation has been passed by the General Assembly whereby an elaborate free school system has been established in this State, and the management and control of the public schools of the State have been placed by such legislation in the hands of boards of school directors and boards of educa-

tion, the members of which boards are elected by the people. The powers of such boards are very broad, and the determination of the questions whether or not the Bible, or any of the translations thereof, and if any, which one, shall be read in the public schools, rests primarily with those boards, and their determination of those questions cannot be reviewed or controlled by the courts.

In *McCormick* v. *Burt, supra,* Edward McCormick brought an action on the case against Cora Burt and the directors of the school she was teaching, to recover damages on account of his suspension by the board of directors from the benefits of the school for the non-observance of a rule adopted by them for the government of the school. The substance of the rule adopted was, the teacher might read, as an opening exercise, every morning, not occupying more than fifteen minutes, a chapter from the King James translation of the Bible. No one was required to be present at or participate in such exercise unless he chose to do so, and while such exercise was being conducted every pupil was required to lay aside his books and remain quiet. The plaintiff was a Catholic, and for the non-observance of the rule, which it was alleged was void as an interference with the religious convictions of plaintiff and his father, the plaintiff was expelled. A demurrer was sustained to the declaration, and this court, in affirming the judgment of the lower court, after referring to the powers conferred upon the board of school directors, on page 265, said: "In the performance of the duties imposed by law upon school directors they must exercise judgment and discretion. What rules and regulations will best promote the interests of the school under their immediate control, and what branches shall be taught and what text books shall be used, are matters left to the determination of the directors and must be settled by them from the best lights they can obtain from any source, keeping always in view the highest good of the whole school."

In *Board of Education of Cincinnati* v. *Minor, supra,* the board of education of the city of Cincinnati adopted a rule prohibiting the reading of the Bible in the public schools of that city, and the plaintiffs, who were tax-payers, filed a bill to enjoin the board of education from enforcing said rule. The *nisi prius* court gave judgment for the plaintiffs and perpetually enjoined the enforcement of the rule. The judgment of the lower court was reversed by the Supreme Court on the ground that the legislature of the State had placed the management of the public schools under the exclusive control of directors, trustees and boards of education, and the courts had no rightful authority to interfere with the management and control of the public schools of said State.

In *Donahoe* v. *Richards, supra,* the plaintiff brought an action to recover damages for expelling him from the district school in the town of Ellsworth for having refused to read from the protestant revision of the English Bible, which the school committee had regularly prescribed to be used as a reading book in the public schools of said town. The court said: "The right to prescribe the general course of instruction and to direct what books shall be used must exist somewhere. The legislature have seen fit to repose the authority to determine this in the several superintending school committees. They may therefore rightly exercise it. * * * The power of selection is general and unlimited. It is vested in the committee of each town. It was neither expected nor intended that there should be entire uniformity in the course of instruction or in the books to be used in the several towns in the State. The very distribution of power manifestly shows that no such intention could have existed. The manner of its exercise must depend upon the judgment, discretion and intelligence of the different committees. The actual selection at any given time and place depends upon the views and opinions of those upon whom the law devolves this duty. The power

of ultimate decision must rest somewhere. No right of appeal is granted. No power of revision is conferred upon any other tribunal. Because the right of selection may be injudiciously or unwisely exercised, it by no means follows that it does not exist. This court cannot make an affirmative rule as to what books shall be selected, nor a negative rule prescribing what shall not be used, if the right of selection be exercised in conformity with existing statutes and the constitution."

We are unable to discover any natural or logical connection between the questions before the court of the construction of our constitution and the sorrows of the Quakers and Roger Williams or the illiberal views and practices of the Puritans in New England or the Cavaliers in Virginia. Those things lend no aid to the determination of the question whether the reading of the Bible in the public schools, without comment, is sectarian instruction. Those matters have no more relation to the controversy in this case than the inability of the court to decide the sectarian controversy between the different branches of the Presbyterian church. That controversy between two organized religious bodies related to sectarian doctrine, and if the decision has any application to this case, the logical conclusion would be that we could not determine whether the reading of the Bible is sectarian instruction or not. In that case, as in all other sectarian controversies, each party disputed the proposition that the Bible contained the teachings of the other sect, and insisted that the sectarian beliefs arose, not from what was contained in the Bible, but from what the other sect read into it. In fact, sectarian differences are rapidly disappearing from the religious world, and the growing general understanding is that the Bible does not teach sectarian doctrine. To hold that the Bible cannot be read in the public schools requires a judicial determination that it teaches the doctrine of some sect, and if that is so we ought to be able to say what sect.

It is said in the majority opinion that a child cannot hear the Scriptures read in the public schools without being instructed as to the divinity of Jesus Christ, which would be an affront to a large and intelligent religious denomination whose members do not admit that it teaches such a doctrine, and the same may be said of the other sectarian beliefs mentioned in the opinion. Free-thinkers and atheists do not constitute a sect which is an organized religious body, and the prohibition against sectarian instruction, which relates only to the teaching of the doctrine of a particular sect, has no application to them. The constitution is not directed against the Bible, but applies equally to all forms and phases of religious beliefs. If the Bible is to be excluded because it pertains to a religion and a future state, heathen mythology must go with it. Moral philosophy must be discarded because it reasons of God and immortality, and all literature which mentions a supreme being, or intimates any obligations to him, must be excluded. We cannot conceive that the framers of the constitution, or the people, intended that the best and most inspiring literature, history and science should be excluded from the public schools, so that nothing should be left except that which has been sterilized, so as not to interfere with the beliefs or offend the sensibilities of atheists.

The majority opinion seems to proceed upon the theory that the people cannot be trusted to determine, through their constitutionally elected school officers, the question whether the Bible shall be read in the public schools of the State, for fear that where Protestants are in the majority the King James version will be read and where the Catholics are in the majority the Douay version will be read, and that by leaving the question to the determination of the school boards (where it has heretofore rested) "a religious contest may be expected at each election of a school director." The principle which lies at the basis of our government is that majorities must control in the determination

of all questions which affect the public, and that principle applies here as it does in the decision of all public questions. The State of Illinois is a Christian State. Its people, as a people, are a Bible reading people, and its citizens who are students of and believers of the Bible are not all found in the churches. We are of the opinion the decision of the question whether the Bible shall be read in the public schools should be left where it has rested from the foundation of the State and through its entire history,—*i. e.,* with the local school boards,—and this court, with a view to foreclose the people by its decision upon the question whether they desire to have the Bible read in the public schools, should not read into our State constitution, as the majority opinion does, a provision excluding the Bible and all its translations from the public schools, and that especially should this be true in view of the well known historical fact that the framers of the constitution of 1870 expressly refused to incorporate into the constitution a provision excluding the Bible from the public schools when that provision was offered in that convention, and declared by its action in declining to incorporate into the constitution such provision, in the view of the members of that convention, the question whether the Bible should be read in the public schools should rest with the several school boards of the State, where it had rested under the constitutions of 1818 and 1848. While it is true this court may construe the constitution, it has not the power, and it should not, under a pretext to construe the constitution, amend it, and certainly not in a case like this, where the effect of the amendment will be to deprive many thousands of children living in this State of any knowledge of the principles taught in the Bible, as the Bible is not taught in all the homes of the State, and the only knowledge which a large number of children in this State will ever gain of the Bible must be through the public schools, and if they do not get such knowledge there it will be lost to them entirely. We

therefore most respectfully dissent from the majority opinion and earnestly protest against a result which excludes the Bible from the public schools of the State.